2024 IL App (1st) 241356

FIFTH DIVISION
October 25, 2024

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

No. 1-24-1356

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 01 CR 17492 |
| | ) | |
| KEVIN JACKSON, | ) | Honorable |
| | ) | Angela M. Petrone, |
| Defendant-Appellant. | ) | Judge Presiding. |

PRESIDING JUSTICE MIKVA delivered the judgment of the court.
Justice Oden Johnson concurred in part and dissented in part, with opinion.
Justice Mitchell concurred in part and dissented in part, with opinion.

**OPINION**

¶ 1    Twenty-one years ago, a jury convicted defendant Kevin Jackson of first-degree murder and aggravated battery with a firearm. The State's case rested on the out-of-court statements of four eyewitnesses who, at trial, all recanted, insisting that they had been coerced by the detectives investigating the case into falsely identifying Mr. Jackson as the shooter. Their trial testimony was corroborated by the surviving victim, who testified that Mr. Jackson looked "nothing like" the man who shot him.

¶ 2    On direct appeal, this court considered whether we could uphold a conviction resting on nothing more than recanted statements. Noting that there was considerable disagreement on that question, we ultimately sided with those cases concluding that, under appropriate circumstances,

such statements alone could be sufficient. *People v. Jackson* (*Jackson I*), 364 Ill. App. 3d 1050, slip order at 11-16 (2006) (table) (unpublished order under Illinois Supreme Court Rule 23). We were confident that was the case here because we believed, as the State told the jury in its closing argument, that the recanted statements were corroborated by the forensic evidence. *Id.* at 16.

¶ 3    Over the years, as one after another of Mr. Jackson's challenges to his convictions were rejected—see *People v. Jackson* (*Jackson II*), No. 1-07-1680 (Apr. 29, 2009) (affirming the summary dismissal of his initial *pro se* petition for postconviction relief), *People v. Jackson* (*Jackson III*), 2018 IL App (1st) 171773 (affirming the denial of his motion for leave to file a successive postconviction petition), affirmed by *People v. Jackson*, 2021 IL 124818—additional evidence has surfaced both that there was another suspect the police never investigated and that the detectives in this case have been accused of intimidating and coercing witnesses in a number of other cases.

¶ 4    Mr. Jackson's case was reviewed by the State's Conviction Integrity Unit (CIU), which initially decided to take no action. An apparent conflict of interest—a member of the CIU was married to Detective Brian Forberg, one of the lead detectives in this case—prompted the State on September 5, 2022, to appoint Thomas F. Geraghty and Robert C. Owen as Special Assistant State's Attorneys (SASAs) to independently review Mr. Jackson's case. The SASAs and their team, including ASA Heather Hu, who was assigned by the Cook County State's Attorney's Office to assist them (collectively, the reinvestigation team), conducted a sweeping investigation, reviewing the paper record, interviewing witnesses, and hiring independent experts. On August 4, 2023, SASAs Geraghty and Owen and ASA Hu provided the State with their report and recommendations (the reinvestigation report), in which they concluded that Mr. Jackson's convictions "lack[ed] sufficient integrity to be allowed to stand."

2

¶ 5    Having learned of that report, Mr. Jackson filed a petition, under section 2-1401 of the Code of Civil Procedure (Code) (735 ILCS 5/2-1401 (West 2022)), asking that his convictions be vacated. The State did not and has not opposed that relief and has made clear that if Mr. Jackson's convictions are indeed vacated, it will not retry him. The circuit court nevertheless concluded that there was no basis on which to grant Mr. Jackson's petition. Mr. Jackson now appeals.

¶ 6    Everything about this case has been extraordinary—from the troublingly thin evidence upon which Mr. Jackson was convicted, to the disturbing facts that have been uncovered regarding the tactics employed by the detectives in this case, to the State publicly taking the position that it does not oppose the extraordinary relief that Mr. Jackson seeks and that it would not retry Mr. Jackson for these crimes. It is not every day that an authoring justice of this court is willing to reconsider her prior ruling in response to a defendant's petition for rehearing, or that a concurring justice of our supreme court implores the State to further investigate improprieties that may have led to false convictions. It is not every day that SASAs are appointed to conduct a monthslong independent review in addition to the review of the CIU. And it is not every day that individuals so appointed unequivocally conclude that a defendant's convictions cannot stand. All of this, to say the least, has been extraordinary.

¶ 7    In section 2-1401 of the Code, our legislature had the foresight to provide a remedy for extraordinary situations, like this one, where new information has emerged that casts real doubt on the integrity of a judgment—civil or criminal. Before it ruled on Mr. Jackson's petition brought pursuant to that section here, however, the circuit court failed to provide defense counsel with the very reinvestigation report that was the basis for the relief he sought. Without the benefit of defense counsel's arguments based on a full, unredacted version of the report, the court also incorrectly concluded that the reinvestigation team had "found nothing new" and that Mr. Jackson's petition

thus did nothing more than "repeat[ ] the same arguments previously made and ruled on." Having reviewed the petition and the report ourselves, as well as the relevant portions of the lengthy record in this case, we conclude that Mr. Jackson should be granted the relief that he seeks in this petition. Indeed, we conclude that *any* reasonable review of this record demonstrates by a preponderance of the evidence that there are facts that, if known at the time of Mr. Jackson's trial and direct appeal, would have prevented his convictions. We reverse the circuit court's denial of his petition for relief from judgment under section 2-1401 of the Code, vacate his convictions, and remand this matter to the circuit court where, in light of the State's declaration that it will not retry Mr. Jackson for these crimes, it is our expectation that this criminal matter will be concluded.

¶ 8                                          I. BACKGROUND

¶ 9                                       A. Trial and Direct Appeal

¶ 10    The evidence presented at Mr. Jackson's trial and this case's long procedural history have been summarized countless times, by the parties, the circuit court, this court, and our supreme court. We draw as appropriate from those summaries here, elaborating where necessary to explore aspects of the proceedings that bear on Mr. Jackson's section 2-1401 petition.

¶ 11    This case involved a shooting that took place in the early morning hours of May 6, 2001. As we recounted in *Jackson III*:

> "Ernest Jenkins drove his car to a Citgo gas station on the corner of Damen Avenue and 55th Street in Chicago. The car's passengers—Michael Watson and Michael's nephew, Stanley 'Meechie' Watson—exited the vehicle to pump and pay for gas. Shots rang out, and Michael and Mr. Jenkins were both struck. Michael survived, but Mr. Jenkins died of his injuries later that same day. Following a police investigation, Mr. Jackson was arrested on June 19, 2001.

* * *

At trial, the State's theory of the case was that the shooting was a turf dispute involving members of rival gangs. According to the State, Mr. Jackson, known in the neighborhood as 'Googie' or 'Googy,' was a Vice Lord who shot at Meechie Watson, a Gangster Disciple, because the gas station Meechie stopped at was in Vice Lord territory and because, while at the gas station, Meechie talked to Mr. Jackson's girlfriend, Quiana (sometimes referred to as Quina) Davis. Although Meechie escaped unharmed, Michael Watson and Ernest Jenkins, finding themselves between Mr. Jackson and his target, were both shot, and Mr. Jenkins was killed.

To support its theory, the State relied on the signed handwritten statements of four eyewitnesses—Brandy Butler (also known as Brandy Grant or Brandi Grant), Vernon Clay, Manuel 'Manny' Stewart, and Shemika Mason—which were admitted into evidence pursuant to section 115-0.1 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/115-10.1 (West 2000)). That section of the Code provides that prior inconsistent statements are substantively admissible if the witness is subject to cross-examination at trial and the statements were made from personal knowledge and were written or signed by the witness. In their statements, each of these witnesses identified Mr. Jackson as the shooter and indicated that he or she was treated well by the police and not promised anything in exchange for signing a statement. Three of the witnesses—Ms. Butler, Mr. Clay, and Mr. Stewart—also testified before a grand jury, where they confirmed the accuracy and truthfulness of their signed statements.

At trial, however, none of these witnesses identified Mr. Jackson as the shooter. They instead each testified that they had been threatened and coerced by detectives into

signing the statements and giving the grand jury testimony implicating Mr. Jackson. No forensic evidence connected Mr. Jackson to the crime, and Michael Watson, the surviving victim and the only other eyewitness to the shooting who testified at trial, stated unequivocally that Mr. Jackson looked nothing like the man who shot him." *Jackson III*, 2018 IL App (1st) 171773, ¶¶ 4, 7-9.

¶ 12    The pretrial statements—referred to by the State at trial as "signed handwritten statements," although they were written by ASAs and not by the witnesses who purportedly gave them—varied as to certain details but were generally consistent:

"Ms. Butler stated that on May 6, 2001, Manny Stewart drove her, Mr. Jackson, Quiana Davis, and Mario Brown to the Citgo gas station in a car Mr. Stewart and Mr. Jackson owned together. As Ms. Butler exited the vehicle, she saw Meechie Watson, who called out to her and Ms. Davis. Ms. Butler continued into the gas station to make a purchase and, while inside, heard four or five gunshots, looked out the window, and saw Mr. Jackson, a member of the Vice Lords, firing a gun in the direction of Meechie, a Gangster Disciple. Ms. Butler said she then got down on the floor and did not see where anyone went.

* * *

*** Vernon Clay was also at the gas station at the time of the shooting [though he] had walked, not driven, there with Ms. Butler and Ms. Mason. When they arrived, Mr. Clay said they saw Ms. Davis 'jumping out of [Mr. Jackson's] car.' He explained that Mr. Jackson and Ms. Davis were 'fooling around but [we]re not boyfriend and girlfriend.' Mr. Clay told police that he and Mr. Jackson were members of the Vice Lords, and at the gas station that night they saw Meechie, a Gangster Disciple, who 'started talking to [Ms. Davis] about messing around.' Mr. Clay said that he, Ms. Butler, Ms. Mason, Ms. Davis,

6

and Meechie all went into the gas station, while Mr. Jackson and Mr. Stewart remained in their car. Meechie and Ms. Davis were still talking together when the group exited the gas station. It was then that Mr. Clay heard gunshots. He looked up and saw Mr. Jackson fire about eight shots into a parked car and Meechie running away. Mr. Jackson then ran from the scene.

\* \* \*

\*\*\* Ms. Mason said in her statement that Mr. Stewart drove her, "Googi," [referring to Mr. Jackson] Ms. Butler, and Ms. Davis to the Citgo gas station on the night of the shooting. Ms. Mason and Ms. Butler went into the gas station and Ms. Davis stayed outside, talking to a Gangster Disciple member named Meechie. Mr. Stewart and Googi remained seated in the front of the vehicle. Ms. Mason said that, when she left the gas station, Googi was standing near an alley with a gun in his hand, and she saw him fire in Meechie's direction four or five times. In her statement Ms. Mason also said that Googi later warned them not to talk to the police about what had happened.

\* \* \*

\*\*\* Manny Stewart, Mr. Jackson's cousin, stated that he and Mr. Jackson drove to the Citgo gas station together on the night of the shooting—in a car that the two of them owned together and had shared for 'two years at the most'—with Ms. Davis, Ms. Butler, and Mr. Stewart's brother, Mr. Brown. \*\*\* After a couple of minutes, he heard a gunshot, turned around, and saw Mr. Jackson shooting into a parked car, at which point Mr. Stewart drove away from the gas station." *Id.* ¶¶ 13, 17, 22, 27.

¶ 13    At trial, however, each of these witnesses unequivocally denied that Mr. Jackson was the shooter. Each witness explained how the detectives involved exploited their vulnerabilities to get

them to agree to a false version of events:

> "[Ms. Butler] testified [at trial] that she had known Mr. Jackson for '[a] long time,' that they had grown up in the same neighborhood, and that he was 'nowhere around' at the time of the shooting. Ms. Butler testified that she arrived at the gas station with Mr. Stewart, Ms. Davis, and Mr. Brown and, as she was standing in line inside the gas station, she heard 'ten or more' gunshots and 'hit the ground.'

> Ms. Butler gave the following explanation for how she came to sign her statement identifying Mr. Jackson as the shooter:

>> 'I just was ready to go because I was harassed. I was everything. I was three months pregnant. I was going through a lot. I'm stressed out still right now to this day 'cause I lied on him. They had me to lie on him. They told—they coerced me, Judge, I promise you. They made this story up. They kept saying Googie did it. He did not do it. He was nowhere around. And I'm not saying that for the simple fact, you know, that I'm scared of anybody. He didn't do it. He was nowhere around. He was not in the car with us. *** The detectives would not listen to me. They was not trying to hear anything. They told us that if we did not say who did that, that it would be crimes on us 'cause we was there that night at the gas station. And I was just ready to go. And I'm sorry for what I did and I just signed the statement on you because I was ready to go and they said we was gonna beat that case and I just did it because I have kids. I was there that night. I wish I wasn't there. It was a nightmare.'

> * * *

*** Mr. Clay insisted that he was not even present at the gas station for any of these events. He testified that he was sleeping at home at the time of the shooting and did not know anything about it until he was given details by Detective Forberg at the police station. Mr. Clay explained that he only signed what the police claimed was his pretrial statement to the contrary after he was kept in a room at the police station for a whole day before anyone spoke to him and in custody for a total of three days. He claimed that the police threatened him with imprisonment, said it would "cost [him]" if he did not testify, and threatened to inform everyone on the street that he had cooperated with the police and identified Mr. Jackson as the shooter.

* * *

*** Ms. Mason testified that she was not even at the gas station during the shooting. ***Ms. Mason testified that she was interrogated by the police all night before meeting with an assistant state's attorney who wrote out her statement, that the police were 'telling [her] what they wanted [her] to say,' that she 'had a warrant at the time' and 'was running from the police,' and that they promised her that if she 'went along with what they want[ed her] to say,' they would 'take care of [her outstanding] warrant.' Ms. Mason told the jury she signed the statement simply because she did not want to go to jail.

* * *

*** [Mr. Stewart testified] that he was at the gas station with only Mr. Brown, Ms. Butler, and Ms. Davis. Mr. Stewart said that he saw Ms. Davis talking to Meechie, heard gunshots, and drove away from the gas station with Mr. Brown. Mr. Stewart testified that he saw the shooter as he drove away and that it was not Mr. Jackson but rather was an individual named Rick Party, whom Mr. Stewart had initially told the police was the

9

shooter." *Id.* ¶¶ 14-15, 19, 23, 28.

¶ 14 Not summarized at length in this court's prior decisions, but of enhanced significance now, in light of the reinvestigation report and Mr. Jackson's petition, is testimony concerning the trajectory of the bullets in this case. Ms. Mason said in her statement that she saw Googi "standing near an alley but still in the Citgo lot" when he began firing the gun "in the direction of Meechie," who was "standing near the same car which was parked at the gas pump." Ms. Grant and Mr. Stewart provided no information regarding the direction from which the shots were fired. And Mr. Clay stated unequivocally that Googi was shooting into the car "from the passenger side of the car."

¶ 15 Forensic Investigator Robert Tovar testified that he recovered six cartridge cases, five from near the rear of the car, which was parked facing west, at pump number three, and a sixth that was "a little further away" but still to the east of the vehicle, near the east driveway of the gas station. He also recovered a fired bullet from the front mat, on the driver's side floor of the car, and some metal bullet fragments from in front of the vehicle. The driver's side front window was shattered, and there was a bullet hole through the rear window of the car.

¶ 16 Dr. Adrienne Segovia, who was then a deputy examiner with the Cook County Medical Examiner's Office, testified that on the day of the shooting she performed an autopsy on the body of Ernest Jenkins. Two bullets had entered Mr. Jenkins's body near his left armpit and traveled from "left to right and towards the back." One of those had exited his body "on the right side of the back." A third bullet entered his left abdomen, traveled "side to back and downward," and exited "on the left side of the back." A fourth bullet traveled through Mr. Jenkins's left forearm, from the posterior (knuckle side) to the anterior (palm side). The State asked Dr. Segovia if the wounds she described would be consistent with Mr. Jenkins, seated in the driver's seat of the car,

"leaning over to his right at the time that the fatal shots were fired." She agreed that they might, as long as his left side was exposed. The State then asked if the wounds would also be consistent with Mr. Jenkins turning to his left, to face the driver's side window. She said, "It's possible. Again, as long as the left side is exposed, because that's where the entrances are."

¶ 17    During closing arguments, defense counsel criticized the State's attempts to steer Dr. Segovia's testimony as "nonsense," saying, "You heard the State's Attorney trying to get Dr. Segovia to say maybe it was consistent with this guy in the driver's seat somehow turning his body around. I suppose they're going to argue that he turned his whole body around and was facing the rear so the shots come from the passenger's side of the car." Counsel pointed out that the detectives and ASAs had not yet spoken to the medical examiner when they took the witnesses' later recanted statements. Had they done so, counsel argued, they would have understood, "hey, we got a problem here," because the nature of the wounds indicated that someone had shot Mr. Jenkins from the driver's side of the vehicle. That evidence demonstrated, defense counsel argued, that "[s]omeone wanted Earnest Jenkins, not Meechie."

¶ 18    In rebuttal closing argument, the State insisted the medical examiner's testimony supported its theory of the case—that Mr. Jackson and Meechie were arguing near the rear of the car and Mr. Jenkins, in the driver's seat, turned to see what was going on, thus exposing his left side to shots fired in Meechie's direction from the rear of the vehicle. The ASA also argued to the jury that "every one of these handwritten statements and every one of these grand jury transcripts is corroborated by the physical evidence." The State also told the jury to reject defense counsel's theory that this was an execution-style murder with Ernest Jenkins as the target because there was "no evidence of that from the witness stand."

¶ 19    As we noted in *Jackson III*, following closing arguments, the jurors deliberated for

approximately seven hours. *Jackson III*, 2018 IL App (1st) 171773, ¶ 47. They submitted a number

of questions. At one point, they sent out a note saying, "We are ten to two and nobody is changing

their mind. What do we do?" *Id.* ¶ 49. They were told to keep deliberating. They asked to have the

court's preliminary comments to the venire about using their common sense read back to them. *Id.*

That request was denied. *Id.* Sometime after 9 p.m., they asked: "What is the law for hung jury?

How long do we stay tonight? Is there a time limit? How do we sleep?" *Id.* ¶ 47. Having reviewed

the transcripts again, we observe that before this, the jurors had also asked for the diagram of the

crime scene used at trial and, when they were denied that, for a posterboard, markers, and tape.

¶ 20    Noting that the jurors had been "arguing very loudly," defense counsel asked the court to

declare a mistrial. *Id.* The judge agreed that, although specifics could not be made out, there was

certainly "vigorous discussion" going on. *Id.* Optimistic that they were at least still talking, the

judge sequestered the jurors for the evening. *Id.* They reached a verdict in the afternoon of the next

day, finding Mr. Jackson guilty of the first-degree murder of Mr. Jenkins and the aggravated

battery with a firearm of Michael Watson, offenses for which he was sentenced to concurrent terms

of 45 years and 6 years, respectively. *Id.* ¶¶ 48-50.

¶ 21    In Mr. Jackson's motion for a new trial, his counsel argued that the testimony of the medical

examiner establishing that Mr. Jenkins's wounds were all on the left side of his body and that the

trajectory of the wounds was downward and left to right, was consistent with multiple shots fired

from immediately adjacent to the driver's window of the car. Wounds of that nature were

impossible, counsel argued, if, as in Ms. Mason's recanted statement, the shots had been fired from

the alley at the east border of the gas station. And they flatly contradicted Mr. Clay's statement

that the shots were fired from the passenger side of the vehicle. The State had thus both

"impermissibly argued that there was no evidence of an execution-style murder" and

"impermissibly argued that the physical evidence corroborated the handwritten statements and grand jury testimony" when, in fact, "the physical evidence contradicted the statements and grand jury testimony."

¶ 22    In response, the State continued to insist that the recanted statements were "substantially corroborated" by each other and by "the physical and scientific evidence admitted in this case." It had made no improper argument, the State insisted, because there was a bullet hole in the back window of the car, shell casings were found behind the car, and the medical examiner testified that Mr. Jenkins's wounds were "possibly" consistent with him having turned to his left, with the shots coming from the rear of the vehicle. The State insisted that everything it had argued to the jury was a fair inference that could be drawn from the evidence.

¶ 23    The trial court denied the motion, saying that it was "the province of the jurors to sort out the facts and determine what occurred." Mr. Jackson spoke up in court at this point, saying, "I didn't do this, man. *** I didn't do this, your honor." He was instructed to remain quiet, and the court proceeded to sentencing.

¶ 24    On direct appeal, this court considered whether recanted statements, alone, were sufficient to sustain a conviction. *Jackson I*, slip order at 11. Noting a significant split of authority on that question, we elected to follow those cases concluding that a trier of fact was entitled to treat such statements like any other evidence—to be believed or not. *Id.* at 11-16. Because the recanted statements in this case were properly admitted, they were "endowed with a degree of reliability." *Id.* at 15. We noted that here the recanted statements were all largely consistent with each other and "the State presented physical evidence of the bullet's trajectory and the location of recovered cartridge casings, thereby corroborating the accounts of Butler, Mason, and Stewart." *Id.* at 16. Although this court acknowledged that Ms. Butler, Mr. Clay, Ms. Mason, and Mr. Stewart all

13

insisted at trial that they were coerced into identifying Mr. Jackson as the shooter, we "presume[d] that the jury took this into account" in determining their credibility and "[did] not believe that this require[d] a heightened review of the evidence." *Id.* at 17.

¶ 25                    B. Postconviction Proceedings and Appeals

¶ 26    In Mr. Jackson's initial *pro se* petition for postconviction relief filed on March 16, 2007, he argued that he had received ineffective assistance from both his trial and direct appellate counsel. He also argued that the State's knowing use of perjured statements made by the recanting witnesses had denied him a fair trial. The circuit court summarily dismissed that petition as lacking arguable merit, and this court affirmed the dismissal on appeal. *Jackson II*, No. 1-07-1680 (Apr. 29, 2009).

¶ 27    Ten years later, and this time represented by counsel, Mr. Jackson sought leave to file a successive postconviction petition, based on new evidence that he argued established both his actual innocence and, in the alternative, the showing of cause and prejudice required to file a successive petition under the Post-Conviction Hearing Act (725 ILCS 5/122-1 *et seq.* (West 2016)). Mr. Jackson attached to his petition news articles, logs of citizen complaint reports, and documents filed in civil suits, which he argued established a pattern and practice of police misconduct by the detectives involved in this case. He also attached new affidavits signed by two of the recanting witnesses—Mr. Stewart and Ms. Butler—in which they maintained, as they had at trial, that Mr. Jackson was not the shooter and provided further details about the police coercion that resulted in their initial false statements implicating him.

¶ 28    Mr. Jackson also provided the affidavit of Quiana Davis, who was not called to testify at trial. She averred that she saw the shooter, who ran right by her, and recognized him as "someone from the neighborhood." She unequivocally stated that individual was not Mr. Jackson, whom she

had grown up with and would have recognized. Ms. Davis further stated that she was questioned by the police for three days and "they just kept insisting that was the way it happened and pressur[ing] her to confirm their theory, no matter how many times [she] told them they were wrong." Ms. Davis said the detectives threatened to charge her as an accessory to the murder and told her that her daughter would be taken away from her. Unlike the other witnesses, however, she had no outstanding warrants against her, and refused to give a statement saying Mr. Jackson was the shooter.

¶ 29     The circuit court denied Mr. Jackson leave to file the successive petition, and this court affirmed the denial on appeal. *Jackson III*, 2018 IL App (1st) 171773, ¶ 92. We concluded that the evidence of police misconduct Mr. Jackson and his counsel had marshalled in support of his petition, though copious, did not support a freestanding claim of actual innocence but instead merely lent further support to Mr. Jackson's argument, advanced at trial, that the police coerced the recanting witnesses into providing statements identifying him as the shooter. *Id.* ¶ 71. We determined that, except for Ms. Davis's affidavit, the new witness statements were consistent with what the witnesses had already testified to at trial. *Id.* ¶ 73. And we concluded that Mr. Jackson had failed to show that Ms. Davis's exonerating testimony was "newly discovered," as she was clearly in contact with defense counsel at the time of Mr. Jackson's trial. *Id.* ¶ 76.

¶ 30     The authoring justice dissented, however, from the denial of Mr. Jackson's petition for rehearing. *Id.* ¶¶ 97-121 (Mikva, J., dissenting from denial of rehearing). Concluding that this case had "all the hallmarks of one in which the wrong person was convicted," the dissenting justice came to believe that Ms. Davis's affidavit should be considered newly discovered because, although she was "technically known" to Mr. Jackson, he had been precluded through no fault of his own from putting forward her exculpatory statement. *Id.* ¶¶ 101, 111. Trial counsel never called

Ms. Davis as a witness, and Mr. Jackson pointed out that failure as a basis for a claim of ineffective assistance of counsel in his initial *pro se* postconviction petition. *Id.* ¶ 107. The dissenting justice concluded that the "combined strength" of this new evidence, in addition to the evidence of police misconduct—and when considered in light of the extremely thin evidence of guilt presented at trial—warranted further proceedings. *Id.* ¶¶ 120-21.

¶ 31    Our supreme court affirmed, concluding that the material regarding police misconduct attached to Mr. Jackson's petition was "not relevant to establishing a pattern and practice of witness intimidation by the interviewing detectives in this case" and principles of fundamental fairness did not require the court to treat Ms. Davis's affidavit as newly discovered. *Jackson*, 2021 IL 124818, ¶¶ 39, 43. Justice Neville specially concurred (*id.* ¶¶ 49-55 (Neville, J., specially concurring)), noting that "[w]here, as here, there has been a recurrence of complaints of intimidation and coercion from multiple witnesses in the same investigation," the State was "duty bound" to undertake an investigation into those allegations (*id.* ¶ 55).

¶ 32                 C. Petition for Relief Pursuant to Section 2-1401 of the Code

¶ 33    On December 5, 2023, Mr. Jackson filed an unopposed petition for relief from judgment, pursuant to section 2-1401 of the Code (735 ILCS 5/2-1401 (West 2022)). Mr. Jackson stated in his petition that SASAs Geraghty and Owen and ASA Hu had conducted "an exhaustive 13-plus month re-investigation of every aspect of [Mr. Jackson's] case." Though not in possession of a copy of the reinvestigation report, Mr. Jackson pleaded on information and belief what he understood to be the team's principal findings and recommendations: namely, that experts retained by the State had concluded that the investigation leading to Mr. Jackson's arrest and trial was "flawed in many serious ways" and that Mr. Jackson was innocent. Mr. Jackson asked the court to vacate his convictions and order his immediate release from custody. The State had represented,

according to Mr. Jackson, that it did not oppose this relief and did not intend to re-charge or retry him.

¶ 34    One month later, after Mr. Jackson had received a heavily redacted version of the reinvestigation report, he extensively supplemented his petition. In that supplement, his counsel made clear that the reinvestigation report, a redacted version of which was attached, was "incorporated by reference as if fully set forth herein both redacted and unredacted." At the time of that filing, the State was refusing to produce the unredacted report, on the grounds that it contained protected work product, but had provided a copy to the court for *in camera* inspection.

¶ 35    The unredacted report is 77 pages long. It describes in detail the reinvestigation team's review of the trial and postconviction record, the State's files, including the CIU's investigation file, and a significant portion of the Public Defender's case file. It describes how the team interviewed witnesses—both those who testified at trial and some who did not—as well as the lead prosecutor who tried the case, the attorneys who led the CIU's investigation, and the public defender investigator assigned to the case. The reinvestigation team also hired a polygraph expert and two expert crime scene investigators.

¶ 36    The reinvestigation team concluded that Mr. Jackson's convictions lacked integrity because (1) there was "an unacceptably high likelihood that the prior witness statements that form[ed] the sole evidentiary basis for Jackson's conviction[s] were obtained by pressure, coercion, and overreaching by the police," (2) their polygraph expert had concluded that the police falsely told two witnesses that they had failed polygraph examinations, leading one of those witnesses to identify Mr. Jackson as the shooter, and (3) new evidence existed, in the form of the expert reports of Dr. Jack Hietpas and Dr. Joseph Peterson, "that the crime scene investigation was negligently conducted and seriously incomplete" and that, contrary to what the State repeatedly

told the jury, the forensic evidence did *not* corroborate the witnesses' recanted statements. "Our experts' one firm conclusion from the now-available forensic evidence," the authors wrote, was that "the shooter was firing from the *driver's* side of the car in which the decedent victim was located." That "directly contradict[ed] the evidence presented at trial, where a key prosecution witness [Mr. Clay] claimed to have seen Jackson shooting into the victims' car from its *passenger* side." (Emphasis in original.)

¶ 37    The authors of the report concluded that Mr. Jackson should be allowed to file a successive petition for postconviction relief, that the State should not oppose the petition or an evidentiary hearing on its merits, and that "a new trial would likely be ordered." They urged the State to "consider agreeing to vacate Kevin Jackson's conviction[s] in the interest of justice and allowing him to be released from custody, and not retrying him."

¶ 38    The circuit court denied Mr. Jackson's petition in a 32-page written order entered on June 24, 2024. Following a lengthy summary of the evidence and proceedings in this case, the court analyzed Mr. Jackson's petition and reinvestigation report in a few short paragraphs. The circuit court concluded that the "current filings repeat[ed] the same claims and the same arguments that were previously made and rejected multiple times," that the SASAs had "found nothing new," and that "[t]he few additional arguments [were] not of such conclusive character they would have made a difference in the outcome of the trial."

¶ 39    After the court ruled on the petition, on July 8, 2024, Mr. Jackson finally received an unredacted copy of the reinvestigation report, and that report has been made part of the record in this appeal.

¶ 40                                    II. JURISDICTION

¶ 41    The circuit court denied Mr. Jackson's section 2-1401 petition on June 24, 2024, and he filed his notice of appeal the same day. We have jurisdiction pursuant to Illinois Supreme Court Rule 301 (eff. Feb. 1, 1994) and Rule 304(b)(3) (eff. July 1, 2017), which governs appeals from "judgment[s] or order[s] granting or denying any of the relief prayed in a petition under section 2-1401 petitions of the Code."

¶ 42                                    III. ANALYSIS

¶ 43    Section 2-1401 of the Code establishes a statutory procedure for a party seeking to vacate a final judgment entered more than 30 days prior. 735 ILCS 5/2-1401(a) (West 2022). Section 2-1401 provides different relief than that afforded by the Post-Conviction Hearing Act. "To obtain relief under this section, a defendant is not required to establish a constitutional violation." *People v. Brown*, 169 Ill. 2d 94, 107 (1995). Rather, a section 2-1401 petition requires the court to determine "whether facts exist that were unknown to the court at the time of trial and would have prevented entry of the judgment." *People v. Pinkonsly*, 207 Ill. 2d 555, 566 (2003). Relief should be granted under this section "when necessary to achieve justice." *People v. Lawton*, 212 Ill. 2d 285, 298 (2004).

¶ 44    Although characterized as a civil remedy, section 2-1401 petitions may also be used to seek postjudgment relief in criminal cases. *In re Detention of Morris*, 362 Ill. App. 3d 321, 323 (2005). Petitions made under this section, though filed in the same case in which the judgment was entered, are not a continuation of the underlying litigation but a collateral attack that commences a new proceeding. 735 ILCS 5/2-1401(b) (West 2022); *Warren County Soil & Water Conservation District v. Walters*, 2015 IL 117783, ¶ 31. To prevail, a petitioner must establish by a preponderance of the evidence "(1) the existence of a meritorious defense; (2) due diligence in

presenting this defense; and (3) due diligence in filing the section 2–1401 petition for relief." *Warren County*, 2015 IL 117783, ¶ 37.

¶ 45                                    A. Standard of Review

¶ 46    The State argues that we should review the circuit court's denial of Mr. Jackson's section 2-1401 petition for an abuse of discretion, and that under that deferential standard, we can affirm the circuit court. Mr. Jackson argues that because no evidentiary hearing was held, we should consider his petition *de novo*. We agree with the State as to the standard of review, although not with its suggestion that this decision can be affirmed under that standard.

¶ 47    As our supreme court explained in *People v. Vincent*, 226 Ill. 2d 1, 9 (2007), there are five possible final dispositions of a section 2-1401 petition: "the trial judge may dismiss the petition; the trial judge may grant or deny the petition on the pleadings alone (summary judgment); or the trial judge may grant or deny relief after holding a hearing at which factual disputes are resolved." The *Vincent* court concluded that where the merits were reviewed based on the petition, with no evidentiary hearing, appellate review was *de novo*. *Vincent*, 226 Ill. 2d at 18. Following *Vincent*, courts struggled to square *de novo* review of a section 2-1401 petition with a long history of postjudgment relief based on equitable considerations.

¶ 48    In *Warren County*, 2015 IL 117783, ¶ 22, our supreme court addressed this tension, concluding that *Vincent* should be read only as an endorsement of *de novo* review for a petition that "raises a purely legal issue" because "that type of petition will not involve a factual dispute." *Id.* ¶ 47. In *Warren*, our supreme court made clear that a petition raising a fact-dependent challenge must instead "be resolved by considering the particular facts, circumstances, and equities of the underlying case." *Id.* ¶ 50. "The quantum of proof necessary to sustain a section 2-1401 petition is a preponderance of the evidence, and the circuit court's ultimate decision on the petition is

20

reviewed for an abuse of discretion." *Id.* ¶ 51. Because Mr. Jackson's petition clearly raises a fact-dependent challenge to his judgment of conviction, we review the circuit court's ultimate decision for an abuse of discretion.

¶ 49    An abuse of discretion occurs where the court's action is "arbitrary, fanciful or unreasonable," or where "no reasonable person would take the view adopted by the trial court." (Internal quotation marks omitted.) *Spencer v. Wandolowski*, 264 Ill. App. 3d 611, 621 (1994). Here, we find that the circuit court abused its discretion in the manner in which it considered Mr. Jackson's petition. On the merits, we further find that *any* reasonable jurist reviewing the record in this case, Mr. Jackson's petition, the unredacted reinvestigation report, and counsel's arguments based on that report, would conclude by a preponderance of the evidence that there are facts that, if known at the time of Mr. Jackson's trial and direct appeal, would have prevented his convictions.

¶ 50              B. The Circuit Court Abused Its Discretion in the Manner in

Which it Ruled on Mr. Jackson's Section 2-1401 Petition

¶ 51    Although, as discussed below, one member of this panel disagrees on the appropriate next steps to take, the panel is in unanimous agreement that the circuit court abused its discretion by ruling on Mr. Jackson's unopposed section 2-1401 petition without his counsel having access to the unredacted reinvestigation report, where the circuit court judge reviewed and relied on the unredacted report in its ruling and did not rule on defense counsel's motion to compel production of that report until after it denied Mr. Jackson's petition.

¶ 52    When defense counsel first filed Mr. Jackson's section 2-1401 petition on December 5, 2023, they had no copy of the reinvestigation report and alleged on information and belief what they believed that document contained. The State, acknowledging that the contents of the report were helpful to Mr. Jackson's efforts, provided him with a heavily redacted version of the report

21

on December 20. 2023, which defense counsel used to supplement Mr. Jackson's petition.

¶ 53    The parties were in court on December 20, 2023, and defense counsel handed up to the judge a copy of the redacted report, from which significant portions, including the authors' final conclusions, had all been stripped. The court noted that page after page of the report was fully redacted, and concluded, "this doesn't look like it's going to be that helpful." Defense counsel agreed and made an oral motion at that time to compel the State to produce the unredacted report, on the basis that it would be "informative both to the Court and to us." Finding that was "not an unreasonable request," the judge asked for the State's position on the matter. The State objected to the unredacted report's production, on the grounds that it was part of its office's deliberative process and work product. At that point, the judge gave the redacted report back, saying, "I don't accept things that are redacted like this," ordered the State to provide the unredacted report for the court's *in camera* review, and told the parties, "I'll determine if it's work product. Okay?"

¶ 54    The State complied with the court's order on December 22, 2023. At a status hearing on January 3, 2024, defense counsel said to the judge, "If you decide to have a hearing on those issues of privilege, we would like an opportunity to brief it. Very short, just a few days." The court said, "I agree. I agree that you should." Nearly four months later, on April 26, 2024, the circuit court had still not ruled on Mr. Jackson's motion to compel. Counsel filed a short reply in support of its motion, reminding the judge that she had indicated in December that she would rule on the State's assertion of privilege. Counsel argued the failure to produce the unredacted report constituted a violation of Mr. Jackson's due process, as set out in *Brady v. Maryland*, 373 U.S. 83 (1963).

¶ 55    The circuit court had still not ruled on the motion to compel when, on June 24, 2024, the judge read her lengthy written order denying Mr. Jackson's section 2-1401 petition into the record. Defense counsel again asked for a ruling on the motion to compel, saying to the judge, "You've

clearly referred to the reinvestigation report in your ruling, and so once again, we think that that is germane to our case, and we should have it." Counsel also argued that any claim of privilege was moot because the report had been leaked by an unknown source to news media just days before. When the judge indicated that it was the first she had heard of defense counsel's request, he pointed out both that the motion had been made six months before and that he had filed a supplemental brief asking for the court's promised ruling over a month prior.

¶ 56    The parties returned to court on July 8, 2024. The judge concluded that the motion to compel production of the report was moot, as the contents of the unredacted report had already been considered by her and disclosed in her ruling. "As that ruling shows," the court stated, "the report contain[s] nothing exculpatory, so cannot be classified as containing *Brady* material." Given that the unredacted report had been disclosed to news outlets, the judge said that she "ha[d] no problem" granting defense counsel's request for its production at that time, "in case [they] want[ed] to include some specific quotes or something from it on appeal."

¶ 57    Although the circuit court generally has broad discretion to manage its own docket (*Bank of America, N.A. v. Land*, 2013 IL App (5th) 120283, ¶ 24), here it was an abuse of that discretion for the court to rule on Mr. Jackson's petition before ruling on his motion to compel production of the unredacted report. As our supreme court has observed, "[c]ounsel almost always know a great deal more about their cases than we do." (Internal quotation marks omitted.) *People v. Givens*, 237 Ill. 2d 311, 324 (2010). In both civil and criminal cases, therefore, "in the first instance and on appeal, we follow the principle of party presentation." *Id.* at 323. "[W]e rely on the parties to frame the issues for decision and assign courts the role of neutral arbiter of matters the parties present." *Id.* Obviously, counsel for Mr. Jackson could not fully frame the issues on behalf of their client where they lacked full access to a report that both the State and the court had and that everyone

23

recognized was the basis for the section 2-1401 petition.

¶ 58    A court abuses its discretion when its conduct is "arbitrary, fanciful, or unreasonable, or where no reasonable person would adopt the court's view." *TruServ Corp. v. Ernst & Young LLP*, 376 Ill. App. 3d 218, 227 (2007). Here, it was arbitrary and unreasonable for the court to rule on Mr. Jackson's petition without the benefit of arguments developed by his counsel following *their* review of its contents. If the redacted portions of the report were indeed privileged, as the State contended, then the judge should not have relied on them in reaching her decision, something she clearly did.

¶ 59    As discussed extensively in this opinion, this case has had a long and tortured history. The entire premise for the section 2-1401 petition was the lengthy and detailed reinvestigation report, which put the new evidence that was uncovered by the reinvestigation team into the context of that history and the evidence presented at trial. The circuit court's failure to order the State to provide the reinvestigation report to defense counsel was an abuse of discretion that tainted the process and requires reversal. It limited defense counsel's ability to present a fully informed argument, which likely contributed to, as discussed below, the court's failure to focus on significant new evidence in that report.

¶ 60                            C. The Appropriate Remedy Following Reversal

¶ 61    What, then, is the appropriate remedy? One member of this panel (see *infra*, ¶¶ 103-109) favors remanding this matter so that Mr. Jackson's lawyers can amend his petition to include more detailed allegations, make any arguments based on the unredacted report that they were prevented from making before, and allow the circuit court to decide the petition anew, based on a specific stipulation of facts, an admission as to well-pleaded facts in the amended petition, or a hearing at which some or all of the witnesses and experts who spoke to the reinvestigation team would be

called to testify.

¶ 62    Justice Mitchell argues, relying in part on emails attached to Mr. Jackson's reply brief, that defense counsel was warned by the State that the petition they filed did not contain sufficient factual allegations, so that the State's failure to answer that petition has no evidentiary meaning. Our reading of that email exchange is merely that the State knew the contents of the reinvestigation report were important to Mr. Jackson's efforts, that it was working diligently to create a redacted version to give to his counsel, and that if defense counsel did not want to wait for the redacted report before filing, it should plead everything it could to ensure that Mr. Jackson's section 2-1401 petition was not summarily dismissed before it could be amended to incorporate by reference the redacted report. Justice Mitchell also argues that the State never stipulated to the accuracy of the contents of the reinvestigation report itself, although he acknowledges that the State agreed that Mr. Jackson's conviction should be overturned and that he should not be retried. His view is that, absent a factual stipulation or an evidentiary determination, the relief Mr. Jackson seeks here is not available and that these proceedings should begin anew with a new section 2-1401 petition.

¶ 63    The majority of this panel does not agree that this is necessary or that the delay this would entail in resolving this case is merited. Mr. Jackson incorporated the reinvestigation report into his petition by reference. The State never answered or objected to the petition. As our supreme court has made clear, where a respondent elects not to answer a section 2-1401 petition, by operation of law that "constitutes an admission of all well-pleaded facts" and permits the circuit court to "decide the case on the pleadings, affidavits, exhibits and supporting material before it, including the record of the prior proceedings." *Vincent*, 226 Ill. 2d at 9. Thus, at a minimum, the State's failure to answer the petition is an admission that the incorporated reinvestigation report was what it purported to be—an extensive reanalysis of whether Mr. Jackson's convictions could stand

25

prepared by members of the State's Attorney's office and specially appointed assistant State's attorneys.

¶ 64    While we agree with Justice Mitchell that the petition does not include specific well-pleaded facts, the attached report sets out what numerous witnesses would have testified to. This summary of testimony, which Mr. Jackson proffered to the court and which the State never objected to or questioned, is in the nature of a stipulated bench trial, in which the parties stipulate to expected testimony. An evidentiary stipulation, after all, is "nothing more than an acknowledgment of what a witness would testify to if called, and a concomitant decision not to challenge the testimony the witness would give." 34 Ill. L. and Prac. *Stipulations* § 17. By not answering or objecting to the petition, the State has acknowledged that the reinvestigation report accurately describes how a large number of witnesses would testify if called at a hearing. This appears to us to be an appropriate evidentiary basis for consideration of the merits of this petition.

¶ 65    Moreover, the statute specifically provides that a section 2-1401 petition must be supported "by an affidavit *or other appropriate showing* as to matters not of record." (Emphasis added.) 735 ILCS 5/2-1401 (West 2022). In our view, the reinvestigation report was such an "appropriate showing" and, together with the lengthy record in this case, which this court has also considered, provided a basis for deciding the merits of Mr. Jackson's petition.

¶ 66    Satisfied that additional proceedings on Mr. Jackson's petition are unnecessary, we turn to the merits of the petition.

¶ 67                    D. The Merits of the Petition

¶ 68    Perhaps of greatest significance is the fact—which was never mentioned by the circuit court in its lengthy decision—that the reinvestigation report summarized new expert forensic evidence establishing for the first time that the shots came from the driver's side of the car. This

new evidence contradicts the State's theory that the shots were fired from the rear of the vehicle at Meechie, and Mr. Jenkins was struck by them when he turned around to see what was going on. And it supports defense counsel's alternative theory that the target of the shooting was instead Mr. Jenkins, and that the shots were fired directly at him through the driver's side window.

¶ 69    Critically, this new testimony, as summarized in the reinvestigation report, makes clear that the forensic evidence did *not*, as the State repeatedly assured the jury, corroborate "every one of [the recanted] handwritten statements." Two of the four witnesses said nothing about the direction of the shots, but the other two witnesses in their later-recanted statements were explicit. According to Ms. Mason's statement, the shots were fired from somewhere in the alley, which was to the north of the west-facing vehicle, and according to Mr. Clay's statement, the shots were fired into the car "from the passenger side."

¶ 70    At trial, no forensic evidence was presented regarding the trajectory of the bullets that killed Mr. Jenkins. The medical examiner testified regarding the direction of the *wounds*, which ran from left to right through his body, but was equivocal as to where the bullets may have been fired from, depending on whether Mr. Jenkins was facing forward, leaning to one side, or turning around in his seat. The State argued at trial that this could be read as consistent with the later-recanted statements of Ms. Mason and Mr. Clay. We now know that is not the case. The physical evidence contradicts, rather than confirms, both the State's theory and the recanted statements of these two witnesses.

¶ 71    This is significant. There are indications in the record that the trajectory of the bullets was an important issue for the jury. They asked for the diagram of the scene of the crime used by Officer Tovar and, when denied that, they requested a posterboard, marker, and tape.

¶ 72    The trajectory of the bullets was clearly a significant issue for *this* court as well. When we

27

affirmed Mr. Jackson's convictions on direct appeal, we relied expressly on the fact that "the State presented physical evidence of the bullet's trajectory and the location of recovered cartridge casings, thereby corroborating the accounts of Butler, Mason, and Stewart." *Jackson I*, slip order at 16.

¶ 73    In sum, the new forensic experts retained by the reinvestigation team now unequivocally conclude that the trajectory of the bullets—a question that appears to have been of real concern to the jurors and which *both* sides argued supported their version of events—does *not* support the State's theory of the case. The "corroborating" forensic evidence that this court relied on in Mr. Jackson's direct appeal, which reassured us that he could be convicted based solely on the recanted statements of eyewitnesses who testified at trial that they were coerced by the detectives in this case (*id.* at 11-16), is completely refuted by this new evidence. These experts conclude that the bullets were fired from the driver's side of the vehicle. That is consistent with Mr. Jackson's theory that Mr. Jenkins was the target, and unequivocally refutes the State's theory that the bullets were fired from the rear of the car. This forensic analysis of the medical examiner's testimony now makes clear that rather than corroborating the recanted statements of the State's eyewitnesses, the trajectory of the bullets flatly contradicts those statements.

¶ 74    Not *once* in her lengthy written order denying Mr. Jackson's petition did the circuit court ever mention this new evidence. This, despite the fact that the reinvestigation report made clear: "Our experts' one firm conclusion from the now-available forensic evidence [is] that the shooter was firing from the *driver's* side of the car in which the decedent victim was located." (Emphasis in original.)

¶ 75    The reinvestigation report also included additional and compelling evidence to support the claims of the recanting witnesses that they were harassed, coerced, threatened, and badgered into

giving incriminating out-of-court statements about Mr. Jackson. The witnesses made these claims at Mr. Jackson's trial, but we assured ourselves on direct appeal that his convictions could still rest on the recanted eyewitness statements because "we presume[d] that the jury took this into account in determining the witnesses' credibility" and "[did] not believe that this require[d] a heightened review of the evidence." *Id.* at 17. Our supreme court held, when it affirmed the denial of Mr. Jackson's motion for leave to file a successive postconviction petition, that the additional evidence his counsel had compiled in that petition regarding misconduct by the interviewing detectives in this case was insufficient to establish a specific pattern and practice of witness intimidation. *Jackson*, 2021 IL 124818, ¶¶ 33-39.

¶ 76     The reinvestigation report, however, contains 10 pages detailing *additional* allegations that have continued to emerge, including instances in which Detective Forberg took statements from witnesses who later recanted, threatened witnesses with the loss of access to their children, and falsely told witnesses that they had failed polygraph tests. Without appearing to consider this new information at all, the circuit court concluded that the reinvestigation report had absolutely nothing new to offer in this regard. While this was not completely uncharted territory, the contents of the report certainly added to what should have been growing concern that these out-of-court and later-recanted statements were not evidence on which Mr. Jackson should have been convicted. Indeed, the authors of the report concluded, based on the totality of the evidence of police misconduct, that there was "an unacceptably high likelihood that the prior witness statements that form[ed] the sole evidentiary basis for [Mr.] Jackson's conviction[s] were obtained by pressure, coercion, and overreaching by the police."

¶ 77     Our supreme court concluded, when it affirmed the denial of Mr. Jackson's motion to file a successive postconviction petition:

"The material regarding police misconduct attached to [Mr. Jackson's] successive petition [wa]s not relevant to establishing a pattern and practice of witness intimidation by the interviewing detectives in this case. As such, [Mr. Jackson] ha[d] not satisfied the 'prejudice' prong of the cause-and-prejudice test, and leave to file was properly denied with respect to this claim." *Id.* ¶ 39.

However, as noted above, the specific showings that may be necessary on a postconviction petition are different than those required on a section 2-1401 petition. *Brown*, 169 Ill. 2d at 107. This additional evidence is sufficient to confirm for any reasonable person that the State's witnesses were not truthful in their out-of-court statements and were honest when they testified at trial that they only gave those statements because of intense pressure and improper coercion by the police.

¶ 78    Finally, the reinvestigation team pointed in its report to an additional witness who would testify that Mr. Jackson was not the shooter. The surviving victim here, Michael Watson, affirmatively testified that Mr. Jackson was not the gunman he saw advancing on Mr. Jenkins's car, that he in fact looked "nothing like" the man who shot him. Neither Michael nor his nephew Stanley "Meechie" Watson, the supposed target of the shooting, identified Mr. Jackson as the shooter from photo arrays or in-person lineups. As the reinvestigation team noted in their report, when the CIU's investigators spoke with Stanley Watson in 2019, he recounted how he had arrived at Mr. Jackson's trial in response to a subpoena and opened the courtroom door but was not permitted to enter. He told them, however, that the shooter was "very dark-skinned," darker than Stanley himself, and darker than the man he observed from the courtroom doorway and believed to be Mr. Jackson. The CIU team dismissed this, on the basis that they could not confirm the person Stanley was talking about was in fact Mr. Jackson. The reinvestigation team points out, however, that the transcripts demonstrate both Stanley and Michael Watson were admonished by the court

regarding their subpoenas just after Mr. Jackson was brought into the courtroom and his presence announced. Stanley Watson would thus clearly have observed and understood that Mr. Jackson was the defendant in this case before talking to the CIU. The reinvestigation team concluded that the CIU team's 2019 interview with Stanley Watson thus constituted "a striking, affirmative statement by [him] that Jackson was not the shooter."

¶ 79     When we held on direct appeal that the recanted eyewitness statements in this case were alone sufficient to uphold Mr. Jackson's convictions, we specifically found the cases that Mr. Jackson relied on for the contrary proposition distinguishable because there, "the witnesses' testimony was severely impeached *and/or coerced*, and *the State did not have a scintilla of corroborating evidence*." (Emphases added.) *Jackson I*, slip order at 13. The new evidence put forward by the reinvestigation team in their report, which details specific allegations of similar intimidation and coercion by the detectives involved in this case and which unequivocally refutes the State's argument that evidence of the bullets' trajectory corroborated the recanted statements, now places this case squarely in that camp. These are facts "that were unknown to the court at the time of trial" and, *under this court's own reasoning*, "would have prevented entry of the judgment" (*Pinkonsly*, 207 Ill. 2d at 566) on Mr. Jackson's convictions.

¶ 80     We strongly disagree with Justice Mitchell's contention, *infra* ¶ 113, that information in the reinvestigation report does not rise to the "conclusive level required to support relief under section 2-1401." As this court's own decision on direct appeal makes clear, had the appellate court known both that the bullets' trajectory did not match the recanted statements of the State's witnesses and that Detective Forberg and his unit had a long history of coercing false statements to secure convictions, Mr. Jackson's initial appeal would have been successful, and his convictions would have been reversed based on insufficient evidence. This is as "conclusive" a result as we

can imagine could ever be gleaned from the hindsight that we must employ at this point in these proceedings.

¶ 81    Having reviewed the lengthy record in this case, Mr. Jackson's petition, and the unredacted reinvestigation report, we believe that any reasonable person would have to conclude that the report contains new information demonstrating by a preponderance of the evidence the existence of a meritorious defense: that these convictions resulted solely from coerced and false statements. Mr. Jackson and his counsel diligently sought access to the State's reinvestigation report and diligently presented the report's findings to the court, and the State, based on that report, has elected not to oppose the vacatur of his convictions. Mr. Jackson's section 2-1401 petition for relief from judgment should have been and hereby is granted.

¶ 82                    D. Mr. Jackson's Requests for a Certificate of Innocence

and Reassignment to a New Judge on Remand

¶ 83    Mr. Jackson asks this court to issue him a certificate of innocence in addition to vacating his convictions. Two justices on this panel believe that we are in no position to grant that relief. To obtain a certificate of innocence, a criminal defendant must "file a petition *** in the circuit court" (735 ILCS 5/2-702(b) (West 2022)) and show by a preponderance of the evidence that (1) he was convicted of a felony and served all or part of the sentence, (2) the judgment of conviction was reversed or vacated, and the indictment or information dismissed, (3) he is innocent of the offenses charged, and (4) he did not by his own conduct voluntarily cause or bring about his conviction (*People v. Washington*, 2023 IL 127952, ¶ 28).

¶ 84    Mr. Jackson certainly already meets some of these criteria. He was convicted of a felony and has served a significant portion of his sentence. He has always maintained his innocence and has clearly done nothing to bring about his own convictions. And we do, through this opinion,

vacate those convictions.

¶ 85    However, no petition for a certificate of innocence has yet been filed, and the time for doing so is not quite ripe. The State has said that it will dismiss all charges, but it has not yet had the opportunity to do so. Mr. Jackson may well succeed on a petition for a certificate for innocence. The authors of the reinvestigation report concluded that there was "powerful evidence that Jackson may be innocent," and the State has indicated it will nol-pros the charges against him. That matter is simply not before us in this appeal.

¶ 86    We find it unnecessary to consider Mr. Jackson's request that we remand this case to a different judge. We remand it solely to allow the State, as it has indicated it will do, to dismiss all charges. If Mr. Jackson chooses to seek a certificate of innocence, it is our understanding that a petition for such relief would be heard by the presiding judge of the criminal division, and not by the circuit court judge who has decided this petition.

¶ 87                                  IV. CONCLUSION

¶ 88    For all of the above reasons, we reverse the circuit court's denial of Mr. Jackson's petition for relief from judgment under section 2-1401 of the Code, vacate his convictions, and remand this matter to the circuit court.

¶ 89    Reversed and remanded.


¶ 90    JUSTICE ODEN JOHNSON, concurring in part, and dissenting in part:

¶ 91    I concur wholeheartedly with the judgment and opinion, insofar as it concludes that we must reverse the circuit court's denial of defendant's section 2-1401 petition and vacate defendant's convictions.  However, I write separately because the majority denies defendant's request for a certificate of innocence on the ground that this issue is "not quite ripe" (*supra* ¶¶ 83-

86), whereas I believe that the issue is ripe for our consideration, and I would grant the certificate.

¶ 92   Defendant devoted a two-page section of his brief to this topic, and the State similarly replied in a multi-page section of its own brief, thereby making this issue fully briefed and ripe for our decision.

¶ 93   Justice Neville previously observed:  "the burden of correcting an illegal conviction must be borne by all of the participants in the criminal justice system."  *In re: N.G.*, 2018 IL 121939, ¶ 101 (J. Neville, specially concurring). It is manifestly unfair to place this "onerous burden on lay defendants who are the least equipped to undertake that burden because they lack legal skills and do not know how to navigate the legal system."  *N.G.*, 2018 IL 121939, ¶ 101 (J. Neville, specially concurring).

¶ 94   The outcome today seems to be a direct result of his former special concurrence in this case where he wrote:

> "Where, as here, there has been a recurrence of complaints of intimidation and coercion from multiple witnesses in the same investigation, the prosecutor has an obligation to investigate those allegations to ascertain whether the statements and grand jury testimony identifying petitioner as the offender were the product of witness intimidation or coercion.  In my view, the State's Attorney is duty bound to undertake that investigation, and I encourage her to do so."

*People v. Jackson*, 2021 IL 124818, ¶ 55.

¶ 95   Section 2-702 of the Code of Civil Procedure (735 ILCS 5/2-702 (West 2022) governs the process for obtaining a certificate of innocence. It requires a defendant to show by a preponderance of evidence that he was convicted of a felony, that the conviction was vacated, that he is innocent of the offenses charged, and that he did not voluntarily bring about his own conviction.  735 ILCS

5/2-1702(g) (West 2022). All these points have been amply established on the record here. The standard is the same standard, namely, a preponderance, that the majority already applied in the context of his section 2-1401 petition.

¶ 96    Defendant argued:  "If this Court vacates Mr. Jackson's conviction and sentence, and acknowledges the State's intention to *nolle prosequi* his case, then Mr. Jackson will satisfy all four elements required to obtain a certificate of innocence."  The majority has now done everything in the dependent clause of that sentence—vacated the conviction and sentence, and acknowledged the State's intent to nol pros—thereby making his argument ripe for our consideration.

¶ 97    Section 2-702 requires the notification of the Attorney General and the State's Attorney of the county where the conviction was had. 735 ILCS 5/2-1702(e) (West 2022).  That has already been done here, and the State has indicated that it will not make any attempt to retry defendant.

¶ 98    As this court has observed before, since the conviction has already been vacated, a section 2-702 proceeding is "structurally an uncomplicated civil proceeding." *People v. Hood*, 2021 IL App (1st) 162964, ¶ 30.  A party can obtain relief on uncontested pleadings and attached exhibits, and "[t]his is typically done through summary judgment proceedings." *Hood*, 2021 IL App (1st) 162964, ¶ 30.  This court has found that section 2-702 contemplates proceedings that are adversarial in nature and, as a result, it fails to offer procedural instructions for how to proceed when the State does not present any rebutting evidence. *Hood*, 2021 IL App (1st) 162964, ¶ 31; *People v. Simon*, 2017 IL App (1st) 152173, ¶ 24. Where the State does not offer any rebutting evidence, "the petitioner need only establish a *prima facie* case for relief because there is no contrary evidence." *Hood*, 2021 IL App (1st) 162964, ¶ 31. A *prima facie* case has certainly been established here.

¶ 99    Section 2-702 begins with the declaration that the "General Assembly finds and declares

that innocent persons who have been wrongfully convicted of crimes in Illinois and subsequently imprisoned have been frustrated in seeking legal redress due to a variety of substantive and technical obstacles in the law." 735 ILCS 5/2-1702(a) (West 2022). The legislative purpose, then, is to remove obstacles, not create them.

¶ 100    In light of the decades that this defendant has already spent languishing in jail,[1] the clear intent of the legislature to redress just the type of wrongful actions that occurred in this case, the relevant findings we have already made by a preponderance of the evidence, the State's expressed intent to nol pros the case, I would exercise the powers given to us by Supreme Court Rules 366 and 615 to grant his request for a certificate of innocence. Ill. S. Ct. R. 366(a)(5) (eff. Feb. 1, 1994) (a reviewing court may "enter any judgment and make any order that ought to have been given or made"),[2] R. 615(b) (a reviewing court may "modify any or all of the proceedings subsequent to or dependent upon the judgment or order from which the appeal is taken"). See also Ill. Const. 1970, art. VI, § 6 (an appellate court may exercise original jurisdiction "when necessary to the complete determination of any case on review").

¶ 101    I do not understand the need to put this defendant through another proceeding when he has already been through so many in his 20-year quest for justice.

¶ 102    I take no position at this time as to whether the double jeopardy clause bars a retrial of defendant, because the State has indicated its intent to nol pros and we are not in the business of offering advisory opinions. However, if the State does not act as indicated and seeks to reprosecute (*infra* ¶105), and defendant asserts a double jeopardy bar, I am concurring with the majority with

---

[1] Defendant's brief asked us to grant this relief now, pursuant to these rules, "in the interests of justice and judicial efficiency."

[2] Section 2-702 and section 2-1401 are both part of the Code of Civil Procedure. Thus, contrary to the State's argument, Rule 366 would apply.

full expectation that this panel will take an appeal from the trial court's ruling on an interlocutory expedited basis.

¶ 103   JUSTICE MITCHELL, concurring in part and dissenting in part:

¶ 104   In denying the defendant's petition to vacate his convictions, the circuit court entertained a petition bereft of any factual allegations and wholly unsupported by admissible evidence. And it did so at the urging of defense counsel, who invited the circuit court to decide the petition based on an *in camera* review of a "reinvestigation" report that defense counsel had not seen (C 360, 375). Complicating this unorthodox situation, the State declined to agree to a factual basis for the petition, although it did not oppose the ultimate relief sought by the defendant. In our system that depends so heavily on adversarial proceedings, this put the circuit court in an impossible position without any guidance from counsel in pleading or proof as to what constituted the factual basis for the petition. Yet, despite the missteps of counsel and the very real specter of invited error, I agree with my colleagues that the circuit court abused its discretion in ruling on the petition.

¶ 105   Where we part company is on the necessity of a remand: a circuit court's error ordinarily does not allow the aggrieved party to win its case outright, but rather the party gets a do-over. This case proves no exception. The defendant's petition contains *no* well-pled allegations of fact that would support vacating his convictions, and the record is devoid of any admissible evidence to support granting such relief. As a consequence, I would remand the case to the circuit court to permit the defendant to amend his petition to plead those specific facts that he believes entitle him to relief and to append to his petition any supporting evidence. The State can then admit or deny those specific factual allegations, and, if necessary, the circuit court can resolve any factual disputes with an evidentiary hearing. That is what the law requires. Whether the defendant would

ultimately prevail on his petition, whether any of the "new" facts in the reinvestigation report would prove true, whether the State would elect to retry the defendant, or whether the defendant would ever qualify for a certificate of innocence[3]—these are all questions to be answered on remand (or beyond) and, in my estimation, well outside the proper scope of this appeal.

¶ 106  In order to prevail on a petition to vacate a criminal judgment under section 2-1401 of the Code of Civil Procedure, a petitioner must plead and prove that facts exist—which, if known at the time of the original judgment—would have prevented its entry. 735 ILCS 5/2-1401; *People v. Haynes*, 192 Ill. 2d 437, 461 (2000). This exceedingly high standard reflects the public policy in favor of the finality of judgments. The petition is not a substitute for a direct appeal or a post-conviction petition, and "[p]oints previously raised at trial and other collateral proceedings cannot form the basis of a section 2-1401 petition for relief." *Haynes*, 192 Ill. 2d at 461. Thus, a successful petition must plead the existence of new facts that were "unknown to the petitioner and court at the time judgment was entered." *Id.*

¶ 107  The defendant's petition here consists of twelve paragraphs recounting a brief procedural history, a legal conclusion that he "was wrongfully convicted," and the fact that the Cook County State's Attorney does not oppose the relief he seeks. What the petition does *not* allege is any factual basis for vacating the original judgment of conviction. Indeed, after reviewing a proposed draft of the defendant's petition the night before it was filed, the First Assistant State's Attorney warned defense counsel that the draft petition was facially deficient: "Please file a petition alleging the facts and evidence in support of a vacatur and attach any documentation in support thereof to ensure that the court does not summarily dismiss your petition on its own." Accord *Smith v.*

_____

[3] A reviewing court has no authority in the first instance to issue a certificate of innocence, so I concur with Presiding Justice Mikva in denying the defendant's request.

*Airoom, Inc.*, 114 Ill. 2d 209, 220 (1986) ("[P]etitioner must affirmatively set forth specific factual allegations***.").

¶ 108   These pleading requirements are not just procedural niceties. Without specific allegations, it is impossible to assess whether "new" facts exist that would have precluded entry of the original judgment. While the majority rightly observes that the State's failure to answer or otherwise plead to the petition "constitutes an admission of well-pleaded facts," the point is that there are *no* facts alleged in the petition. The majority suggests that an "attached report" supplies facts (*supra* ¶ 64), but *nothing* was attached to the petition that the defendant filed (C 359-62), not even an affidavit from the defendant. The petition does reference the existence of the reinvestigation report, but the defendant does not attach a copy of the exhibit, quote the relevant provisions in the pleading, or attach an affidavit "stating facts showing that the instrument is not accessible to him or her." 735 ILCS 5/2-606 (West 2022). As such, the petition does not incorporate the reinvestigation report by reference.

¶ 109   The parties here *could* have stipulated to facts in support of the relief sought in the petition. Parties routinely agree to a factual basis in agreed criminal dispositions. See Ill. S. Ct. R. 402(c) (eff. July 1, 2012) ("The court shall not enter final judgment on a plea of guilty without first determining that there is a factual basis for the plea."); accord *McCarthy v. United States*, 394 U.S. 459, 466-67 (1969). But in the proceedings below and in this court, the State has consistently maintained that it does *not* agree to the facts in the reinvestigation report. The State only agreed not to oppose the relief sought in the petition.

¶ 110   The record demonstrates that in the weeks leading up to the filing of the petition, the relationship between defense counsel and the Cook County State's Attorney's Office turned so acrimonious that the State petitioned for the appointment of a special prosecutor. It alleged that

defense counsel had threatened to "report individuals to the ARDC" (R 2600). The parties traded various recriminations that contradict any suggestion of a stipulation. According to defense counsel's sworn declaration, in a November 2023 phone call, "Ms. Foxx related a number of grievances," accused defense counsel of being "racist and misogynistic" and "entitled," and asked, "do you know how many people claim to be wrongfully convicted!?" (C 382). Defense counsel responded by telling Ms. Foxx that if she was "just going to yell" at him, "then there's no point in continuing this conversation" and hung up. (C 383). Defense counsel complained that prosecutors reneged on a promise of a joint motion and "engaged in further curious and erratic behavior" (C 377). Against this backdrop, it is abundantly clear that there was no agreement between the parties as to anything beyond the relief sought in the petition.

¶ 111   As to the reinvestigation report itself, it is a summary document that contains layer upon layer of hearsay not subject to any recognized exception. See Ill. Rs. Evid. 803 (eff. Jan. 25, 2023), 804, 805 (eff. Jan. 1, 2011). In short, the report is not admissible evidence, but it suggests the existence of admissible evidence helpful to the defendant (a reason for a remand). As the majority notes, the report summarizes witness interviews in which it is now alleged that police engaged in misconduct in securing the original statements identifying the defendant (*supra* ¶¶ 75-77). If this *really* happened, then this would be new evidence justifying the relief sought. But these allegations in the report are wholly untested. Indeed, the authors of the reinvestigation report contemplated an evidentiary hearing on the merits before any relief could be granted.

¶ 112   Similarly, the majority credits expert forensic opinions summarized in the report, but it has never seen the experts' actual opinions, the experts' reports, evidence depositions or any of the bases for the experts' opinions (*supra* ¶¶ 68-74). This matters not just because an expert's opinion must be based on facts and data that give the opinion sufficient probative force to render it

substantial evidence. Ill. R. Evid. 703 (eff. Jan. 1, 2011); *People v. Comier*, 2020 IL App (1st) 170500, ¶ 81. More critically, in the context of a section 2-1401 petition, the opinion must be "new" evidence previously unavailable: an opinion based on historic facts from a "new" expert is not sufficient. *People v. Patterson*, 192 Ill. 2d 93, 140 (2000) (expert report not new where it could have been obtained through due diligence at the time of trial). In contrast, an expert opinion based on some new scientific understanding or technology not in existence at the time of trial would plainly be new evidence. Here we have no idea (another reason for a remand).

¶ 113   As to the statement of Stanley Watson (*supra* ¶ 78), he was known to the defense at the time of trial, appeared pursuant to defense subpoena, and the defense elected not to call him as a witness:

> "[E]very single day of this trial, Stanley Meechie Watson came in after the proceedings were over and you ordered him to return the next day. *** The defense obviously didn't want him as a witness, but he was here every day pursuant to their subpoena. They could have called him if they wanted to. They did not. They chose not to." (R 1177).

The defendant can *never* show the due diligence required under section 2-1401 when he failed to call a witness available to him. See *People v. Coleman*, 2013 IL 113307, ¶ 100 (holding that the testimony of two witnesses who did not testify at trial could have been discovered through the exercise of due diligence where the defense knew about the witnesses prior to trial). Further, this is not "new" evidence. The defendant already raised this point in his posttrial motion (C 83) and in his postconviction petition (C 181-82). Finally, Watson's account is cumulative because his uncle, Michael Watson, did testify at trial that the defendant "don't look nothing like the guy" (R 632). In short, this cannot justify granting relief under section 2-1401. *Haynes*, 192 Ill. 2d at 461.

¶ 114   The principal authors of the reinvestigation report are experienced criminal defense

attorneys. Significantly, they did not recommend that a section 2-1401 petition be used to correct the perceived injustice in the defendant's convictions. Rather, those seasoned defense attorneys recommended that a successive postconviction petition be pursued with the significantly lower burden to win a new trial. The authors then recommended that the State elect not to retry the defendant. After their exhaustive review of the entire case, the authors of the reinvestigation report concluded that "*a new trial might possibly result in a conviction*" (emphasis added), suggesting that the evidence as a whole does not rise to the conclusive level required to support relief under section 2-1401. See, *e.g.*, *People v. Hallom*, 265 Ill. App. 3d 896, 906 (1994) ("In order to be entitled to relief under section 2-1401, the newly discovered evidence must be (1) so conclusive that it would probably change the result if a new trial is granted; (2) discovered after the trial; (3) of such character that it could not have been discovered prior to trial in the exercise of due diligence; (4) material to the issues; and (5) not merely cumulative to the trial evidence.").

¶ 115   In rummaging through the 83-page reinvestigation report, the majority picks and chooses, crediting some facts and disregarding other facts, highlighting certain conclusions while ignoring others. All this without testimony from a single witness. And further, the majority does this with little guidance from counsel—the very sin the majority identifies in the circuit court's handling of the case (*supra* ¶ 57). Vacating a murder conviction is serious business. It should not be done on a wing and a prayer. Section 2-1401 requires that a petition be supported by admissible evidence, and there is simply none in this record. What this record does show is that a jury and no fewer than 16 judges have already rejected many of the defendant's arguments. See 3/15/04 judgment of conviction (Clay, J.); *People v. Jackson*, 364 Ill. App. 3d 1050 (2006) (table) (direct appeal) (Theis, Karnezis, and Erickson, JJ.); *People v. Jackson*, No. 1-07-1680 (2009) (postconviction) (Theis, Murphy, and Quinn, JJ.); *United States ex rel. Jackson v. Hardy*, No. 09 C 7774, 2011 WL

1357310 (N.D. Ill. Apr. 11, 2011) (federal habeas) (Kendall, J.); *People v. Jackson*, 2018 IL App (1st) 171773 (successive postconviction) (Mikva, Pierce, and Harris, JJ.), affirmed by *People v. Jackson*, 2021 IL 124818 (A. Burke, Garman, Theis, M. Burke, Overstreet and Carter, JJ.) and (Neville, J., specially concurring).

¶ 116   I cannot say on this record one way or the other if the defendant is entitled to the relief that he seeks. What I can say is that "justice"—a sometimes elusive concept that we strive to achieve in every case—requires more.

***People v. Jackson*, 2024 IL App (1st) 241356**

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 01-CR-17492; the Hon. Angela M. Petrone, Judge presiding. |
| **Attorneys for Appellant:** | Brandon R. Clark and Elizabeth A. Thompson, of Saul Ewing LLP, of Chicago, and Elizabeth Bacon, of Brooks, Tarulis & Tibble, LLC, of Naperville, for appellant. |
| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney, of Chicago (C. Thor Martin and Enrique Abraham, Assistant State's Attorneys, of counsel), for the People. |