2025 IL App (1st) 231340

SIXTH DIVISION
December 26, 2025

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County |
| | ) | |
| v. | ) | No. 95 CR 666801 |
| | ) | |
| MARTIN HILL, | ) | Honorable |
| | ) | Michael R. Clancy, |
| Defendant-Appellant. | ) | Judge Presiding. |

_____

JUSTICE GAMRATH delivered the judgment of the court, with opinion.
Presiding Justice Tailor concurred in the judgment and opinion.
Justice Hyman dissented, with opinion.

**OPINION**

¶ 1     This appeal arises from the denial of defendant Martin Hill's postconviction petition after a third-stage evidentiary hearing. The circuit court, who heard the evidence firsthand, found the affidavits and testimony of Hill's three witnesses not credible and not of such a conclusive character that would probably change the result on retrial. Giving due deference to the court's findings, which are supported by the record, we affirm.

¶ 2                                    I. BACKGROUND

¶ 3     In 1998, Hill and McKenzie Ranson were jointly tried by separate juries for a shooting that occurred on December 29, 1994. On that date, Hill and Ranson were passengers in a car driven by a third codefendant, Tommy Wilson, who was tried separately. Hill and Wilson were convicted of two counts of murder and one count of attempted murder. Ranson was acquitted. The State argued

No. 1-23-1340

Hill and Ranson shot at a parked car with three people inside, killing two and wounding one. The circuit court sentenced Hill to a mandatory term of life in prison to run consecutively with a 30-year sentence for attempted murder. We affirmed Hill's convictions on direct appeal. *People v. Hill*, 326 Ill. App. 3d 1153 (2001) (table) (unpublished order under Illinois Supreme Court Rule 23).

¶ 4        Hill, who was 15 years old at the time of the offense, filed a *pro se* postconviction petition raising several claims, including a challenge to his life sentence as unconstitutional. After multiple appeals, we vacated Hill's sentence and reversed and remanded to the circuit court for further sentencing. *People v. Hill*, 2022 IL App (1st) 171739-B, ¶ 50. As of May 5, 2023, Hill was no longer incarcerated and discharged from parole.

¶ 5        The issue here centers on Hill's postconviction claim of actual innocence. His petition, as supplemented by counsel, attached three witness affidavits and proceeded to a third-stage evidentiary hearing with live testimony. After the hearing, the circuit court denied the petition, finding Hill's witnesses were not credible and their affidavits and testimony would not make it probable that a new jury would reach a different result. Hill now appeals.

¶ 6                                    A. Hill's Trial

¶ 7        The evidence at Hill's trial is detailed in our decision affirming his conviction. *Hill*, 326 Ill. App. 3d 1153. We repeat it only to the extent necessary to understand this appeal.

¶ 8        Just before midnight on December 29, 1994, Patsy Wolfe, Raven Smith, and Jake Vincent (also known as Vinson) were shot while sitting in a parked car. Wolfe was behind the wheel, Smith was behind Wolfe, and Vincent was next to Smith. Wolfe and Smith died of their injuries. Vincent was shot in the back of the head, recovered, and testified at Hill and Ranson's joint trial.

¶ 9        Vincent testified he heard 10 to 15 shots, "probably more," coming from behind the car. The first shot shattered the back window and hit Vincent in the back of the head. He "slumped" or

"squatted" down in the back seat and heard other shots. The shooting lasted two to three minutes. Vincent testified that he did not see the shooter(s), but he believed they were on foot because he did not see or hear any car. This contradicted other eyewitness testimony and Hill's own statement to detectives that the shooters were in Wilson's car.

¶ 10        LaQuita Ratliff and Cassandra Crudup, both aged 17, also testified at Hill's trial. Ratliff testified in detail about how shortly before midnight on December 29, 1994, she and Crudup were walking home and were about a block from the shooting when Ratliff noticed a maroon Chevy driving slowly on Washtenaw Avenue, moving north toward Washington Boulevard. She described with precision the traffic pattern of the vehicle, multiple turns it made, and its speed. She said Wilson was driving, Hill was in the front passenger seat, and Ranson was in the rear passenger seat. Ratliff had known them for about three months, and they all belonged to the same gang as Ratliff's boyfriend Page.

¶ 11        Ratliff testified she saw a yellow car parked on Washtenaw Avenue facing south with Wolfe in the driver's seat and Smith in the front passenger seat. She knew Wolfe and Smith from "hanging out on the streets." A third person was sitting in the back seat, but Ratliff could not see his face. The maroon Chevy slowed as it pulled up next to the yellow car. Ratliff heard 10 gunshots and saw "sparks" coming from the passenger-side front and back seats, where Hill and Ranson were sitting. Ratliff and Crudup then ran home.

¶ 12        Crudup corroborated Ratliff's testimony. Crudup testified that, shortly before midnight on December 29, she and Ratliff were walking back to their home for girls when she saw a dark red car that she knew belonged to Wilson. Hill and Ranson were also in the car. She saw Hill in the front passenger seat and Ranson in the rear passenger seat behind him. She had known them all for a few months and had once dated Hill. Crudup and Hill broke up about a month earlier after Crudup would not give Hill money, but they were still on speaking terms. There was no testimony

of ill will or a bad breakup at trial.

¶ 13    Crudup testified she heard five or six shots and saw they were coming from the passenger side of Wilson's car. Crudup did not know the three people in the parked car who were shot, but she could see it was "a boy…[,] a lady and a girl." After the shooting, she and Ratliff ran home.

¶ 14    Neither Ratliff nor Crudup told police what they saw or knew about the shooting until February 4, 1995, because they did not want to get involved. Two days later, they viewed separate lineups and independently identified Hill and Ranson in the lineups.

¶ 15    Detective Roy Williams testified that Hill gave a statement at the police station the night of the shooting. Hill said, while he was walking, a car pulled up and Wilson told him to get in the car. Hill said he got into the back seat behind the driver. A few minutes later, they pulled alongside the victims' car, and Wilson and Ranson started shooting. Both had revolvers. They drove away eastbound, and Hill said he went home and went to bed. Hill admitted he had a revolver on him that night but said he never pulled it out. Hill told Williams it was a .32-caliber revolver but told Assistant State's Attorney (ASA) Kathy Dietz it was a .38-caliber. The firearms examiner testified that a bullet from the scene was fired from either a .38-caliber or a .357 Magnum-caliber revolver.

¶ 16    After other witnesses testified and the jury heard closing arguments, Hill's jury convicted him of two counts of murder and one count of attempted murder. In 2001, we affirmed the convictions on direct appeal. *Id.*

¶ 17                                  B. Postconviction Petition

¶ 18    In May 2001, Hill filed a *pro se* postconviction petition, attaching a 1999 affidavit from Vincent that claimed he gave false testimony at trial. Vincent had five attempted murder convictions and met Hill in 1998 while they were both in prison. In his affidavit, Vincent stated that, contrary to his previous testimony, he did see the shooters and identified them as Tyreese Tart, Byron Logan, and Carnell Jackson. Years later, in 2018, Vincent crossed out Jackson's name

from his affidavit. He also provided a second affidavit where he stated he did *not* see the shooters.

¶ 19    In 2015, postconviction counsel filed a supplemental petition and attached an affidavit from Dwond Donahue. Donahue was serving a 72-year sentence for first degree murder and met Hill in prison in 2014. Donahue averred that, at the time of the 1994 shooting, he was driving a friend to a gas station when he saw "Terrell/T-bone" and "Big Byron/Big Homie" walking south on Washtenaw Avenue from Washington Boulevard with their hands in their pockets. As Donahue turned onto Washington from Washtenaw, he saw Terrell and Big Byron shooting in the same direction. Donahue could not tell what they were shooting at. Donahue did not see Hill at the scene and stated, "I know for a fact that Martin Hill is innocent of this crime."

¶ 20    In February 2020, postconviction counsel filed an addendum to Hill's postconviction petition based on an affidavit from Ratliff, who by then was a 39-year-old registered nurse living out of state. Ratliff averred she did not remember "a lot about this case" but remembers not being home when the shooting occurred and only being told by Crudup what happened. Ratliff did not remember if she was with Crudup that evening, but Crudup told Ratliff she witnessed the shooting. Ratliff also said her roommate Regina told her that she saw two people get into "the car" and drive off. Ratliff did not believe that anyone admitted hearing shots. She said she told the detectives she did not see the shooting and only knew about the car, "as that was told to her by Regina." Ratliff remembered going to the police station but did not remember identifying anyone in a lineup. If she did, she said it was only because she was asked if she knew them. She recalled going over police reports several times before trial and "sticking to the script in the police reports."

¶ 21                    C. Third-Stage Evidentiary Hearing

¶ 22    Based on these new affidavits, Hill's postconviction petition advanced to a third-stage evidentiary hearing. The affidavits of Vincent, Donahue, and Ratliff were admitted into evidence, and all three of them testified, giving the court a firsthand look at their credibility and demeanor.

¶ 23        Ratliff testified at the evidentiary hearing that she lived in Memphis, Tennessee. She had a bachelor's degree in behavioral science and was enrolled in a master's program in nursing at the University of Tennessee. Her two sons were in college. Ratliff stated she did not want to testify at the third-stage hearing because she was "moving on" and "almost forgot about [this case]."

¶ 24        Despite her unimpeached, corroborated trial testimony, Ratliff testified at the hearing that she did not hear any gunshots, see anyone shooting, or see anyone get shot on December 29, 1994. She said she found out what happened the next morning when Crudup came in and told her and her roommate Regina what had happened and "just told us that we know who did it. She mentioned [Hill's] name, someone that we call T-Bird and someone we call Page." According to Ratliff, she told police the story that was told to her by Crudup and "never said [she knew] what happened."

¶ 25        Ratliff testified that, a few years after the shooting, detectives from Chicago went to Maryville, a group home where she was living, to speak with her before Hill's trial. Ratliff did not speak with them that day. Instead, her caretaker from Maryville brought her to the court building to speak with ASA Petrakis. Ratliff said, the first time that she spoke to Petrakis, they went over the trial evidence and she "[t]old Petrakis the same thing [she had] been saying for the longest. [She did] not remember what happened. [She] was not there. [She] told a story that was given to [her]." Ratliff stated that she and Petrakis went over that story four or five times preparing for trial. Ratliff admitted that Petrakis "probably" told her that he only wanted her to tell the truth. He never threatened her or told her what to say. She insisted that all she testified to at trial was the "story" of the shooting that was told to her because she did not see or hear anything. She claimed, "I was never asked did I actually eyewitness anything. I was asked about my statement."

¶ 26        Donahue testified he was serving a 72-year sentence for murder with a release date in 2080. In 2014, he met Hill in the prison yard at Menard Correctional Center and learned Hill had been convicted of murder for the shooting on December 29, 1994. At the time, Donahue was an

"enforcer" with the Gangster Disciple gang. On the night of the shooting, Donahue was driving down Washtenaw Avenue to a gas station when he saw two men from a rival gang walking south on the same street: "Terrell," nicknamed "T-bone," and "Big Byron," nicknamed "Big Homey." Donahue drove past, saw them fire, and heard about eight gunshots. Donahue thought he was being shot at, so he "floored" the car, ran a red light, and drove back to his own territory, where he told the gang members who were "higher up" what he had seen. When he heard a girl had been shot, he returned to the scene. Donahue did not speak to police on the scene because that was forbidden by the gang's culture.

¶ 27    After meeting Hill and learning about his conviction, Donahue gave Hill his information because he knew Hill was not the shooter. In January 2015, Donahue met with a defense investigator and signed an affidavit recounting what he had seen. In January 2018, an ASA and an investigator from the Cook County State's Attorney Conviction Integrity Unit (CIU) visited Donahue at Menard Penitentiary. He walked out of the interview after the ASA supposedly "badgered" him.

¶ 28    Vincent testified that on December 29, 1994, he was sitting in a car parked on the west side of Washtenaw Avenue facing Warren Boulevard. He was in the back seat on the driver's side of the car. Wolfe and another woman, whose name he had forgotten, were in the car with him. They were selling drugs, and he was on the lookout. At that point he was "high on drugs." While they were parked on Washtenaw, Vincent heard gunshots and was shot in head but could not remember how many shots he heard. After being shot, Vincent saw Logan, known as "Big B," approach the car on foot. Vincent also saw another person he "grew up with" named Tyreese Tart. Vincent said, a day or two after the shooting, he was threatened by Logan and, about a week after the shooting, Tart threatened Vincent's then girlfriend. Vincent understood the threats to mean that no one should talk to police about what they had witnessed.

¶ 29        When asked about his affidavits, Vincent explained that in March 1998 he overheard Hill and Wilson talking in Cook County jail and realized they were involved in this case. Vincent saw Hill again at Menard Correctional Center in 1998 or 1999 and offered an affidavit. He showed it to Hill before having it notarized. In the affidavit, Vincent identifies the shooters as Tart, Logan, and Jackson. Vincent said Tart had threatened to kill his ex-girlfriend and those she loved, so he did not come forward sooner. Vincent admitted he lied in the affidavit when he swore that Jackson was one of the shooters. He said he was just trying to get Jackson into trouble, but he crossed out his name on the affidavit in 2018.

¶ 30        Vincent was also asked about a second affidavit where he stated he did *not* see the shooters. At the hearing, Vincent explained this by saying he was on an unspecified medication in 2018, which purportedly made him drowsy. Therefore, he wrote that he was unsure of the shooters. He had "heard" that Tart was one of the shooters but did not see Tart with a gun. Vincent also said he did not see Logan shooting a gun, but on redirect examination he testified he saw Logan with a gun.

¶ 31        Investigator Richard Lombard was assigned by the CIU to locate Vincent and Donahue in December 2017. In a January 2018 interview, Vincent told Lombard and ASA Gina Savini he was in the back seat of the car when he was shot and he did not see who shot him. The car moved forward and eventually hit a fence. He did not hear a car driving away, so he thought that whoever shot him was on foot. Vincent said that, a couple days after the shooting, he saw Tart in a housing project and Tart told him, "[W]e know where your girlfriend is at" and used a derogatory term for his girlfriend, which Vincent took as a threat to his girlfriend and "to keep his mouth shut regarding the shooting." Lombard and Savini reviewed Vincent's affidavit paragraph by paragraph with Vincent. They did not tell Vincent what to write, but Vincent said parts of the affidavit were not true, so he made corrections with a red pen.

¶ 32    The same day, Lombard and Savini interviewed Donahue. Donahue told them on the night of the shooting he was driving on Washington Boulevard near the scene when he saw two men walking out of a vacant lot towards a car. He recognized one of the men as Tyreese Tart, whose nickname was "T-Bone," but said he did not know the second man. Donahue heard seven or eight gunshots and saw flashes. He thought he was possibly being shot at, so he sped off. He did not talk to police because "he was a member of a gang and that just was not done."

¶ 33    Lombard and Savini asked Donahue about his handwritten affidavit and inconsistencies with his statements. Lombard testified that, in the affidavit, "[Donahue] said he knew both of those men that he referenced earlier walking from the vacant lot. He referenced one as 'T-Bone' and the other one as 'Big Bryant' or 'Big Homie.' He knew both of them he said."

¶ 34    In 2020, ASA Todd Dombrowski asked Lombard to contact Ratliff. He found her in Tennessee. Although Ratliff initially agreed to meet with Lombard and Dombrowski via Zoom, Lombard lost contact with Ratliff after she stopped answering his telephone calls.

¶ 35    Petrakis, who was the lead prosecutor at Hill's 1998 trial, testified that he met with Ratliff to review her testimony before Hill's trial began. Ratliff never told Petrakis that she did not witness the incident, nor did she tell him that she had repeated only what Crudup had told her. Petrakis also talked to Ratliff once or twice prior to Wilson's trial, but she never told him that she did not witness the incident, nor did she tell him that she had repeated only what Crudup had told her. Petrakis never told Ratliff what to say at trial. He never threatened her or told her that she had to testify consistently with the police reports. Petrakis recalled that Ratliff was initially reluctant to cooperate because she lived in the same neighborhood as Hill and the other defendants. He noted that Ratliff was "very consistent in her testimony, and very sure in her identification testimony in this case. This was a cooperative, bright young lady."

¶ 36    In July 2023, the postconviction court denied Hill's postconviction petition, finding the

evidence presented at the evidentiary hearing, when considered with the evidence presented at trial, "would not likely lead to a different result on retrial." The court found Ratliff gave "incredibly detailed testimony" at trial, "which undercuts her testimony now, some 20 years later, that she was just told what to say." The court continued, "I find Ratliff's testimony at the hearing and her affidavit to lack credibility." The court also found Petrakis's testimony rebutted Ratliff's claim that she was told what to say or was just telling a story she heard. Regarding Vincent's testimony, the court found, "Unlike his consistent, credible testimony at the jury trial, at post-conviction, Vincent flip flops with various versions of an affidavit." Finally, the court noted Donahue "never mentioned his claim of witnessing the shooting to any parties throughout the last decade of the 20th century, nor the first decade of the 21st century" and found his testimony at the hearing "incredible and unworthy." Based on the lack of credible evidence, the court denied Hill's petition.

¶ 37                                                    II. ANALYSIS

¶ 38        For new evidence to be sufficient for granting a defendant a new trial, it must be (i) of a conclusive character that would probably change the result on retrial, (ii) material, not merely cumulative, and (iii) discovered after the trial and be of a nature that the defendant could not have discovered it earlier through due diligence. *People v. Patterson*, 192 Ill. 2d 93, 139 (2000). This is an "extraordinarily difficult [standard] to meet." *People v. Coleman*, 2013 IL 113307, ¶ 94.

¶ 39        At a third-stage evidentiary hearing, the circuit court determines witness credibility, weighs testimony and evidence, and resolves evidentiary conflicts. *People v. Domagala*, 2013 IL 113688, ¶ 34. Because the circuit court is responsible for deciding the facts and is in the best position to observe and weigh credibility, we review the court's decision for manifest error. See *People v. Reed*, 2020 IL 124940, ¶ 51; *People v. Caldwell*, 2023 IL App (1st) 221586, ¶ 17 (citing *People v. English*, 2013 IL 112890, ¶ 23). Manifest error is clear, obvious, and indisputable, or when the opposite conclusion is plainly evident. *Coleman*, 2013 IL 113307, ¶ 98.

¶ 40    The only issue on appeal is whether the new testimony of Ratliff, Donahue, and Vincent is sufficiently conclusive such that it would probably change the result on retrial. See *People v. Harris*, 206 Ill. 2d 293, 301 (2002). After examining the record and giving deference to the postconviction court's credibility findings, we find it would not and that no manifest error occurred. See *People v. Rainey*, 2025 IL App (1st) 231769, ¶ 21 (we defer to the postconviction court when findings of fact depend on the credibility of witnesses, unless they are against the manifest weight of the evidence).

¶ 41    In its ruling, the postconviction court found Ratliff, Vincent, and Donahue all not credible at the third-stage hearing. In contrast, the court found that Vincent's and Ratliff's trial testimony, including identification testimony at trial, was "positive, consistent, and credible."

¶ 42    In particular, the court noted that Ratliff gave "incredibly detailed testimony" at trial, "describing the travel of the car, describing the location of the individuals involved in the shooting, using demonstrative evidence such as diagrams, marking a course of travel that she and Cassandra [Crudup] traveled, marking where the victims' car was, marking where the Defendants' car first was, showing arrows as a direction of travel, identifying which lights were on, streetlights were on." Weighing Ratliff's "incredibly detailed [trial] testimony," which was corroborated by Crudup, against Ratliff's uncorroborated testimony "some 20 years later," which was rebutted by Petrakis, the court did not believe Ratliff's testimony now that she was just told what to say or repeating what she heard. These findings are supported by the record.

¶ 43    At the time of trial, Ratliff was aged 17 and college bound. She testified unequivocally, in first-person past tense, that she was walking with Crudup near their home at Washington Boulevard and Washtenaw Avenue the night of December 29, 1994. She said she saw a maroon car pull up, with Hill in the front passenger seat. She knew Hill because he used to date Crudup and knew the other members in the car as local gang members. The maroon car slowed next to the

car carrying Vincent, Wolfe, and Smith. Ratliff was able to name Wolfe and Smith, but Crudup could not. Ratliff testified she heard gunshots, looked back toward the cars, and saw sparks flying from the front and back passenger's side of the car. Ratliff said she and Crudup ran home as Hill's maroon car drove away.

¶ 44    Ratliff never suggested at trial that she simply heard the story from Crudup or her roommate Regina. She testified to what she observed. Her detailed testimony shows she was there, and Crudup's testimony corroborates this.

¶ 45    Ratliff did not immediately go to police with information about the shooting because she "didn't want to get involved." Twenty years later, she said she still did not want to be involved because she had "moved on" with her life. This is understandable and may explain why, at the third-stage hearing, she said she did not remember witnessing the shooting, walking home with Crudup, and picking Hill out of a lineup back in 1995. Nonetheless, her claim that the entirety of her trial testimony was the product of secondhand information she heard from Crudup or Regina is belied by the record.

¶ 46    For example, Ratliff was asked countless times about her own observations (*e.g.*, "[D]id you see a car?", "Could you see who was sitting in the front passenger seat of that car?") and answered in the first person. Ratliff specifically named occupants of the yellow car being shot at, but Crudup could not. Ratliff participated in a police lineup and distinguished between men who participated in the shooting (Hill and Ranson) and a man that did not (Page). At trial, Ratliff used demonstrative evidence to detail where she was, who she was with, where the cars were located, the direction they were driving, and what she saw the night of the shooting. As put by Petrakis, Ratliff was "very consistent in her testimony, and very sure in her identification testimony in this case. This was a cooperative, bright young lady."

¶ 47    Vincent also "flip flop[ped] with various versions of an affidavit," leading the

postconviction court to conclude his "multiple and varied claims are not worth the paper they are written on." As the court noted, Vincent initially testified at trial, consistently and credibly, that he crouched down in the back seat when the shooting started and did not see who fired into the car. He heard 10 to 15 shots, "probably more" coming from behind the car when he was shot in the back of the head. Vincent waited years to come forward with his affidavit, claiming to know who the shooters were, and came forward only after meeting Hill in prison while serving time for five attempted murder convictions of his own.

¶ 48     Vincent's initial affidavit not only contradicts his trial testimony; it contradicts his second affidavit where he said he did not see the shooters. It also contains the lie that Jackson was a shooter, which Vincent confessed he said to get Jackson in trouble. Given these inconsistencies and circumstances surrounding his recanted testimony, the court was well within its discretion to find Vincent's statements at the third-stage hearing "worthless."

¶ 49     Donahue also did not come forward until he met Hill in prison, 20 years after the shooting. Donahue allegedly saw the entire shooting incident. He said he could identify two of the gunmen but did not know what they were shooting at. He was sure Hill was not one of the shooters, yet he never told police. When investigators from the CIU attempted to interview Donahue, he walked out because he felt they "badgered" him. His story, that two men from a rival gang did the shooting on foot, was directly contradicted by Hill's own admission to police that the shooters were in Wilson's car when the gunfire erupted. The limited nature of Donahue's observations and failure to come forward for 20 years does little to overcome the credible eyewitness testimony at trial and certainly would not change the outcome at a retrial.

¶ 50     The record demonstrates why the postconviction court found the incredibly detailed and consistent testimony at trial, including identification testimony, was far more reliable than the testimony at the third-stage hearing and that the new evidence could not possibly change the

outcome at a retrial. Not only were the delayed timing and limited nature of the postconviction testimony factors, but the inconsistencies within the witnesses' testimony and affidavits were apparent and wholly unworthy of belief. This includes Ratliff's new testimony and affidavit where she claimed to know nothing firsthand about the shooting. The postconviction court, who studied the record, listened to the testimony, and watched the demeanor of the witnesses' testimony when they were questioned and cross-examined, found the new statements "to lack credibility." Based on our examination of the record, we cannot say its decision to reject the new testimony was manifestly erroneous.

¶ 51     The dissent argues, "Time can sharpen," not dull, "a witness's reliability." *Infra* ¶ 108. However, we know that recantation evidence is " 'very unreliable.' " *People v. Steidl*, 142 Ill. 2d 204, 254 (1991) (quoting *People v. Marquis*, 344 Ill. 261, 265 (1931)). Consequently, courts will not grant a new trial on that basis except in extraordinary circumstances (*id.*), which are not present here.

¶ 52     As noted above, there are reasons a witness like Ratliff with an education, career, and family hundreds of miles away may wish to distance herself from her prior involvement in gangs and a murder trial by forgetting everything and "think[ing] of it no more." As Ratliff put it, she is "[l]eading a whole new life" and has "moved on." Given her reluctance to get involved and desire to forget the whole thing, the court was well within its discretion to decide how much weight to give Ratliff's new testimony and ultimately conclude it did not outweigh her clear, consistent, and corroborated trial testimony where she recounted the details in the first-person past tense.

¶ 53     As the postconviction court noted, Crudup did not recant her testimony, which corroborated and was consistent with Ratliff's trial testimony. The court also discounted Hill's suggestion that Crudup had some sort of grudge against Hill because they used to date and had a "really bad argument." The trial testimony shows the opposite. Crudup said she broke up with Hill

because he asked her for money and she refused. They were still on speaking terms, and she was dating another member of his same gang. Ratliff testified she was friends with Hill until she moved away in 1995. Neither woman went to the police right away to say what they saw, and there was no suggestion they had a motive to lie 20 years ago to harm Hill. All this led the postconviction court to find the new evidence was not of such a conclusive character that it would probably change the result on retrial—a standard that is extraordinarily difficult to meet.

¶ 54 The dissent emphasizes the involvement of the CIU, failing to mention that it is the role of the CIU to evaluate claims of actual innocence like these. If its investigation shows a substantial probability that a defendant is innocent, it will recommend some type of relief. Here, there is no indication it recommended relief for Hill or believed there was credible information to support his claim of actual innocence. Nor is there any allegation or implication of police or prosecutorial misconduct in the record, contrary to the dissent's suggestion.

¶ 55 The dissent contends too much focus is given to the trial testimony and deference to the circuit court's findings of fact. Following a third-stage evidentiary hearing, it is the postconviction court, not us, who determines witness credibility, weighs testimony and evidence, and resolves evidentiary conflicts. *Domagala*, 2013 IL 113688, ¶ 34. We may disturb the court's judgment only if it is manifestly erroneous. See *People v. Morgan*, 212 Ill. 2d 148, 155 (2004) (manifest error is "clearly evident, plain, and indisputable" (internal quotation marks omitted)). Giving deference to the court's credibility findings, we discern no such error and agree Hill has not met his burden of showing the postconviction court's decision was not manifestly erroneous or that the opposite conclusion is plainly evident.

¶ 56                                III. CONCLUSION

¶ 57 For the reasons stated, we affirm the judgment of the circuit court of Cook County.

¶ 58 Affirmed.

¶ 59        JUSTICE HYMAN, dissenting:

¶ 60        Over time, what once seemed like a solid conviction can show its flaws. Martin Hill was just 15 when the shooting happened, but the law treated him as an adult, and he was given a life sentence. This punishment took his youth and determined his future. Now, the record, much of it documented by the Cook County State's Attorney Conviction Integrity Unit (CIU), raises real doubts about whether justice was served.

¶ 61        Twice before, in unanimous opinions, I have written about this same defendant, this same case, and this same duty to weigh law and fairness together. Each time, the court spoke with one voice, emphasizing that the law requires facts, not speculation; credibility considered in the context of the whole record; and an evaluation that looks to the effect of the new evidence, not backward to the assumptions of the original trial. See *People v. Hill*, 2020 IL App (1st) 171739; *People v. Hill*, 2022 IL App (1st) 171739-B. Today's decision retreats from those principles.

¶ 62        The majority and I diverge over the basic purpose of postconviction review. My colleagues give renewed weight to a trial record whose reliability is now in serious doubt—a doubt documented by the State's own CIU. Postconviction review exists because a verdict may appear firm until time, distance, and new testimony expose its fractures. Our responsibility is to confront those fractures with care, especially in actual innocence claims, and give them the deliberative attention they deserve.

¶ 63        I believe the law and the new evidence show that this conviction cannot stand without retrial, so I respectfully dissent.

¶ 64                                    *The Record Reconsidered*

¶ 65        The record that once upheld Hill's conviction tells a different story today. What once seemed certain was actually false. Two girls claimed they saw a shooting from a car. One victim survived but could not identify who fired. The State's case against Hill relied on this testimony.

On direct appeal, the court trusted the record and affirmed the conviction. *People v. Hill*, 326 Ill. App. 3d 1153 (2001) (table) (unpublished order under Illinois Supreme Court Rule 23).

¶ 66    We now know what was unknown in 2001. The State's case depended almost entirely on one eyewitness, a troubled youth, LaQuita Ratliff, who decades later says she was not present at the scene but with her family. She did not see who shot the victims, did not hear any shots, and could not describe it because she did not witness it. Prosecutors walked her through police reports until she adopted the story as her own. What the 2001 decision praised as "incredibly detailed" was carefully rehearsed. The record shows police changed focus several times after the shooting, considering different suspects and theories before settling on the story presented to the jury.

¶ 67    The CIU found that Ratliff's new account was supported by another witness, Dwond Donahue, and the surviving victim, Jake Vincent. Donahue, a bystander who knew the neighborhood and its gangs, said the real shooters were older men on foot, retaliating for a separate feud. Vincent also said, as the physical evidence long suggested, that the gunmen were on foot, not in a car. This single fact undermines the State's entire theory.

¶ 68    With three witnesses leading to the same conclusion, there is sufficient probability that the story presented to the jury could not have occurred as described. What seemed to be corroboration was repetition, and what passed for certainty was convenience. Together, the State's 1998 evidence now appears in a different light.

¶ 69    *State's Conviction Integrity Unit*

¶ 70    This case highlights a profound failure of process. When the State's CIU uncovers evidence that undermines the basis of the conviction, the promise of self-correction falters. CIU review is reserved for cases where the prosecution perceives the existing record suggests renewed scrutiny. It does not declare innocence, but it reflects institutional doubt serious enough that the State believed reexamination was necessary. The majority's analysis treats that doubt as legally

insignificant. That is a fatal misstep. When the prosecution signals concern about the reliability of its own conviction, courts must not treat the original record as impenetrable; they must evaluate the new evidence with heightened care, not heightened deference.

¶ 71    The CIU reopened this case not to revisit history but because there were doubts about the verdict's fairness. The majority discusses interview details but overlooks the main point: the prosecution's office thought the conviction needed to be reviewed.

¶ 72    This appeal asks a single, forward-looking question: whether a new jury, hearing the evidence now before us, including evidence uncovered through the State's CIU, could reasonably reach a different result. See *People v. Robinson*, 2020 IL 123849, ¶ 56; *People v. Washington*, 171 Ill. 2d 475, 489 (1996). Whether the CIU ultimately recommended formal relief does not relieve the court of its independent obligation to assess the significance of what that investigation revealed. Evidence developed through this type of review imposes careful judicial examination, not dismissal by reference to the outcome of an internal process. By failing to undertake that examination, the majority leaves unresolved evidence that no longer coheres with the version of events presented at trial.

¶ 73    The majority misconstrues the significance of the CIU's involvement. *Supra* ¶ 54. CIU review is not an adjudicative determination, nor is it a prerequisite to judicial relief. Its role is to investigate claims that deserve reexamination, not to substitute for the court's independent judgment. That no formal recommendation emerged does not negate the substance of what the investigation uncovered. When the State itself undertakes a reinvestigation of a decades-old conviction, the evidence developed through that process deserves careful judicial attention. Treating the absence of a CIU recommendation as dispositive negates the court's responsibility under the Post-Conviction Hearing Act. 735 ILCS 5/122-1 to 122-7 (West 2018).

¶ 74    The majority wrongly treats disbelief as the same as probability, which misapplies the

standard of review and the purpose of postconviction relief. They affirm the decision by relying on the postconviction judge's disbelief of the evidence, but that is not the correct test. There are limits to deference.

¶ 75    At a third-stage hearing, the question is not whether the judge personally believes the witnesses but whether a new jury, hearing their testimony, would likely alter the result. See *Robinson*, 2020 IL 123849, ¶ 56 ("[N]ew evidence supporting an actual innocence claim need not be entirely dispositive to be likely to alter the result on retrial." (citing *People v. Coleman*, 2013 IL 113307, ¶ 97)). When State investigators find evidence that does not match the verdict, judges must review the record more closely. Manifest error review does not mean we accept the circuit court's view without question. See, *e.g.*, Martha S. Davis, *A Basic Guide to Standards of Judicial Review*, 33 S.D. L. Rev. 469, 476 (1988) (lower courts receive "substantial, but not total, deference").

¶ 76    If left unchanged, the majority's decision erodes the Post-Conviction Hearing Act's idea that truth can come out years later through diligence. It also weakens public trust in the courts' ability to correct mistakes when the law and facts show a possible injustice. Actual innocence claims exist because our system knows that sometimes the truth comes out late.

¶ 77                    *The Majority's Analytical Error*

¶ 78    The majority's focus on the trial testimony and its deference to the circuit court's disbelief explains much about its conclusion. As a postconviction case, the testimony and evidence presented at the postconviction hearing, rather than at the trial, warrant the closest scrutiny. Before us is not whether the trial record once appeared persuasive but whether the trial itself was compromised by false testimony. To give controlling weight to the trial record is to misapprehend what is under review, namely, the new evidence and whether it is of such a conclusive character "to be likely to alter the result on retrial." See *Robinson*, 2020 IL 123849, ¶ 56.

¶ 79    Thus, by focusing mainly on the trial instead of the new evidence, the majority inverts the purpose of postconviction review.

¶ 80                                    *LaQuita Ratliff*

¶ 81    According to the majority, Ratliff's trial testimony was "clear, consistent, and corroborated." *Supra* ¶ 52. At trial, Ratliff, a troubled, gang-involved teenager who had smoked marijuana that night, testified that she and her friend, Cassandra Crudup, saw Hill and his codefendant firing from a car. Her detailed account was critical to the State's case. Ratliff and Crudup, 14-year-old first-year high school students living in a foster home, met about three months before the shooting. They become acquainted with others in the neighborhood around the foster home. Ratliff's grandmother resided in a different area of the city, where she had visited that day but had to return to her foster home by midnight due to a curfew. We cannot ignore the effect of peer pressure and the reality facing young girls, barely out of grade school, living in foster care.

¶ 82    Ratliff's years-later testimony was reluctant yet direct: now a registered nurse and a parent, Ratliff stated that she (i) never actually saw the shooting occur, (ii) never saw Hill with a gun, (iii) had no firsthand knowledge of the events, (iv) repeated what Crudup and a roommate had told her, and (v) went over her story several times with the prosecutor before trial. Consequently, what appeared "clear" and "consistent" was the product of restating information repeatedly told to her.

¶ 83    As Ratliff explained, in the week before her trial testimony, the prosecutor reviewed the police reports with her multiple times. For a frightened 14-year-old with no firsthand knowledge of the shooting, that repetition shaped what she later told the jury. At the postconviction hearing, her account was reluctant but unambiguous: she had not seen the shooting and had not seen Hill with a gun, and her testimony at trial was a narrative she absorbed, not an event she witnessed. Once that firsthand foundation is gone, the identification the State relied on is reduced to secondhand impressions formed under pressure, not her personal observation.

¶ 84   The majority treats detail as truth, overlooking that detail can be rehearsed, repeated, and internalized, especially by a teenager being walked through police reports by adults with authority over her. The majority writes, "there are reasons a witness like Ratliff with an education, career, and family hundreds of miles away may wish to distance herself from her prior involvement in gangs and a murder trial by forgetting everything and 'think[ing] of it no more.' " *Supra* ¶ 52. I agree. Initially, Investigator Lombard from the State's CIU contacted Ratliff in 2017, while she was working in Memphis. Lombard testified that, after an initial contact, Ratliff did not return calls to set up a Zoom interview. Despite this natural inclination to put the past behind her, she came forward later and provided a sworn affidavit to support Hill's actual innocence claim.

¶ 85   Ratliff also testified that Crudup, her roommate, was Hill's girlfriend at the time but that the relationship ended poorly days before the shooting. Crudup told Ratliff that Hill had discovered she was seeing someone else, which led to a "really bad argument." This context is significant. Crudup's trial testimony, which placed Hill in the car, cannot be separated from her personal conflict, especially since Ratliff later testified that Crudup was the source of the story she repeated to the police.

¶ 86   The majority observes that, at trial, Ratliff never suggested that she repeated the story told to her by Crudup and her roommate, Regina. *Supra* ¶ 44. This is exactly why our judicial system provides for postconviction procedures—to reexamine a conviction when a witness later comes forward and contradicts her own testimony. Ratliff came forward voluntarily, admitting that, in the week leading up to her trial testimony, the prosecutor had repeatedly rehearsed what she would say in court.

¶ 87   Mistaken eyewitness testimony has become a factor in an alarming number of wrongful conviction cases. See Richard A. Wise *et al.*, *An Examination of the Causes and Solutions to Eyewitness Error*, Frontiers in Psychiatry 1 (Aug. 13, 2014), https://pmc.ncbi.nlm.nih.gov/articles/

PMC4131297/pdf/fpsyt-05-00102 [https://perma.cc/8TKX-3BLT] ("Eyewitness error is a leading cause of wrongful convictions."). Eyewitness testimony is not inviolable, never to be questioned. See *United States v. Wade*, 388 U.S. 218, 228 (1967) (describing well-known shortcomings of eyewitness identification). The facts and circumstances of each case must be carefully evaluated. Postconviction review exists for situations like this, when a witness steps forward to correct the record. Ratliff showed no motive to fabricate now and every reason to leave the past untouched; coming forward at all required courage. Her statements deserved more than the summary dismissal they received.

¶ 88                                    *Cassandra Crudup*

¶ 89        The majority also notes that Crudup did not recant her testimony. *Supra* ¶ 53. But the record shows that at trial, Investigator Richard English testified that he was present as an interview witness when Assistant Public Defender Danahy interviewed Crudup in October 1997 at a foster home. Crudup told him she remembered seeing Hill, Ranson, and Wilson in the car but could not recall who sat where. Crudup said she was ringing the doorbell at the foster home when she heard gunfire about a block away. She never saw guns or flashes coming from the car, nor did she see the maroon car's windows rolled down. That testimony, even if discounted by the jury, remains part of the record and cannot be brushed aside.

¶ 90        The majority relies on Crudup's silence as if it were corroboration. It is not. Crudup did not appear at the postconviction hearing. Her silence does not indicate whether a new jury, hearing the full record, would likely reach a different conclusion.

¶ 91        Once Ratliff withdrew her account linking Hill to the shooting, the evidentiary foundation of the State's case erodes, leaving only Crudup's tenuous and partially impeached testimony.

¶ 92                                    *Dwond Donahue*

¶ 93        Donahue's testimony, despite being delayed, fits the evidence that has persisted. He

testified that on the night of the shooting, while driving toward a gas station, he saw two men, Tyreese "T-Bone" Tart and Byron "Big B" Logan. They were walking south on Washtenaw Avenue with their hands in their pockets. As he turned the corner, he saw them firing several shots and fleeing on foot. Donahue did not see Hill, Wilson, or Ranson.

¶ 94       The State's investigators from the CIU confirmed that Donahue's description matched what he had told them in 2018: two men on foot, one of whom he identified as Tart, hearing seven or eight shots, and speeding away thinking he was the target. His testimony placed the shooters on foot, consistent with Vincent's account.

¶ 95       The majority criticizes Donahue for waiting years to come forward, but the record shows why he delayed. He was a member of the Gangster Disciples, and in that environment, speaking to police was forbidden. As he testified, silence was a matter of survival. His testimony was consistent, unrebutted, and credible. What matters is whether the account, once given, holds together under scrutiny. Donahue's does.

¶ 96       The postconviction court dismissed Donahue's testimony as "incredible," but credibility cannot solely depend on the passage of time. Donahue's account remained consistent from affidavit to testimony. Independent details corroborated it: the direction of the shots, the absence of car sounds, and the gang affiliation of the men he named. His statement, like Vincent's, pointed toward a different set of perpetrators.

¶ 97                                    *Jake Vincent*

¶ 98       Vincent's testimony at trial was limited. He said he ducked and did not see the shooters. Specifically, Vincent testified that he crouched down in the back seat when the shooting started and did not see who fired into the car. He heard 10 to 15 shots, "probably more." The shooting lasted two minutes. When the shooting stopped, he did not see or hear another car drive away, and he told Wolfe to drive off. Wolfe said she had been shot but attempted to drive, hitting a parked

car and eventually ramming into a fence. Vincent then got out and flagged police.

¶ 99 Vincent acknowledged that, before trial, he told defense counsel that he thought the shooters approached on foot.

¶ 100 Years later, in his affidavit, he explained that he had seen the shooters, Tyreese "T-Bone" Tart and Byron "Big B" Logan, both of whom were on foot, but he remained silent due to threats from Tart and Logan. Vincent stated that Logan threatened him a day or two after the shooting. About a week later, Tart threatened Vincent's then-girlfriend. Vincent understood the threats meant no one should talk to the police about what they had witnessed. By the time of Hill's postconviction hearing, both Tart and Logan were deceased.

¶ 101 The majority considers Vincent's inconsistencies while ignoring the crucial point he kept making and that the CIU documented, namely that he heard no car driving away and believed the shooters were on foot. This fact alone seriously undermines the State's theory that the gunfire came from a moving car.

¶ 102 Investigator Richard Lombard and Assistant State's Attorney Gina Savini, assigned to the CIU, interviewed Vincent in 2018. They testified that Vincent told them he heard shots, suffered a head injury, and never heard a car driving away. These statements matched the key details of Vincent's 1999 affidavit and directly contradicted the State's trial theory that the gunfire came from a moving car. He also told them Tart had threatened his girlfriend after the shooting, which explained his silence.

¶ 103 Vincent's recantation of one name, Carnell Jackson, does not invalidate the rest of his account. He explained that he wrongly included Jackson out of anger, but he otherwise stood by his description of Tart and Logan as the shooters. The postconviction court and the majority deem that correction as proof of unreliability, when it is equally evidence of candor. Vincent corrected his error, under oath, years after the trial.

¶ 104    At trial, the State relied on Vincent's uncertainty to fill the gaps in its case. On postconviction review years later, the corrections and minor inconsistencies only amplify that same uncertainty and reinforce renewed scrutiny through a new trial.

¶ 105                              *Codefendant McKenzie Ranson*

¶ 106    Codefendant McKenzie Ranson was acquitted on essentially the same evidence that convicted Hill.

¶ 107    Hill was tried alongside Ranson before two juries, one deciding Hill's case and the other Ranson's. Each jury heard essentially identical eyewitness accounts. Ranson's jury returned a verdict of not guilty. This underscores the critical role that Ratliff's testimony played in Hill's conviction and why its withdrawal removes the case's foundation.

¶ 108    Time can sharpen a witness's reliability. Our supreme court has recognized that recantations must be viewed in light of the circumstances under which the original testimony was given and the witness's current capacity for truth. See *People v. Morgan*, 212 Ill. 2d 148, 163-64 (2004) (evaluating recanted testimony of complaining witness); see also *People v. Steidl*, 142 Ill. 2d 204, 254 (1991) (recantation evidence must be evaluated with care but may warrant relief when corroborated). Ratliff's adult life, far removed from the fears and loyalties of her teenage years, lends her current testimony a different reliability, the reliability of distance.

¶ 109    The majority's assertion that "recantation evidence is 'very unreliable' " does not substitute for case-specific analysis. (Internal quotation marks omitted.) *Supra ¶* 51 (quoting *Steidl*, 142 Ill. 2d at 254). As scholars have shown, treating recantations as categorically unreliable replaces a careful evaluation of the new evidence with an unsupported generalization. See, *e.g.*, Kristy L. Fields, *Toward a Bayesian Analysis of Recanted Eyewitness Identification Testimony*, 88 N.Y.U. L. Rev. 1769 (2013) (discussing systematic misweighing of recantations in postconviction cases). Recantations must be assessed in context: why the original testimony was given, what pressures

shaped it, and how the later account aligns with the rest of the record. Here, Ratliff's recantation is corroborated by independent witnesses, physical facts, and the CIU. Treating recantations as presumptively unreliable circumvents the statutory inquiry the law requires.

¶ 110 Furthermore, the majority fails to acknowledge that there is no physical evidence tying Hill to this shooting. No gun was recovered. No forensics linked him to the shooting. The case rested on the testimony of individuals who later recanted or contradicted themselves; in other words, it depended on a narrative that no longer holds together.

¶ 111 No ballistic evidence connected Hill or anyone else to the shooting. Indeed, while admitting he had a gun, Hill denied ever firing it. No gun was introduced into evidence. No casings were recovered. Of the five recovered bullets analyzed, four came from a .44-caliber firearm, and the fifth bullet was inconclusive but possibly from a .357-caliber firearm. Investigating detective Williams testified at trial that Hill gave a statement in which he said he had a .32-caliber gun but never fired it, and ASA Dietz testified Hill gave a statement that the gun was a .38. None of the five recovered bullets could have been fired from a .32- or .38-caliber gun. This conflicting testimony only establishes what Hill admitted: he had a gun, but he never fired it.

¶ 112 Essentially, the circuit court and the majority have transformed 15-year-old Hill's denial, during an unrecorded interrogation without counsel or a parent present, into a confession.

¶ 113 Claim of Actual Innocence

¶ 114 Our supreme court has stated that a claim of actual innocence requires new, material, noncumulative evidence of such a conclusive character that it could likely alter the result on retrial. *Robinson*, 2020 IL 123849, ¶ 47; *Coleman*, 2013 IL 113307, ¶ 96. The law does not demand certainty of acquittal only a probability that a new jury hearing both the old and new evidence would reach a different result. See *Robinson*, 2020 IL 123849, ¶ 56. This evidence also must be viewed cumulatively, not piece by piece. See *Ortiz*, 235 Ill. 2d at 333-35.

¶ 115    Hill's new evidence meets these requirements. Ratliff's recantation removes the only identification of Hill as a shooter. Vincent's revised account corroborates Ratliff's recantation and aligns with Donahue's testimony. While each witness's story, viewed separately, may have limitations, when combined, they reshape the entire narrative. What once appeared to be a drive-by becomes a shooting by others on foot, challenging the State's theory of guilt.

¶ 116    In contrast, the majority disassembles each witness individually and fails to address the significance of their combined testimony.

¶ 117    Moreover, the postconviction judge discounted the evidence as not "credible," deferring to a two-decade-old record. The judge observed the witnesses but misapplied the standard by demanding certainty rather than probability. See *People v. Reed*, 2020 IL 124940, ¶ 51 (manifest error occurs when opposite conclusion is "clearly evident, plain, and indisputable" (internal quotation marks omitted)). Credibility can evolve as circumstances change, especially when a witness, now an adult, testifies free from the fear and pressure that marked her teenage years.

¶ 118    One final matter: the 911 caller immediately after the shooting stated the shooters were on foot. This witness, Brenda Davis, although mentioned in police reports, was not called to testify for the State at trial. But the postconviction court discounted the line of questioning despite its relevance.

¶ 119    Actual innocence is not a doctrine of perfection; it serves as a safeguard against wrongful convictions that no longer hold up under scrutiny. The doctrine exists to correct cases that, with the introduction of new evidence, no longer rest on a trustworthy foundation. The majority treats disbelief as proof. But the law asks a different question: would a reasonable jury, hearing both the old and the new, probably decide differently? That is this case.

¶ 120    Claims of actual innocence exist for moments like this. The new testimony and affidavits, particularly Ratliff's recantation, strip away the core of the State's case and leave uncertainty in

their wake. The record shows a conviction resting on secondhand statements, an unrecorded interrogation of a juvenile conducted without the presence of counsel or a parent, and no physical evidence.

¶ 121    This case presents the kind of uncertainty that calls for judicial caution. As Justice Mitchell observed, "I cannot say on this record one way or the other if the defendant is entitled to the relief that he seeks. What I can say is that 'justice'—a sometimes elusive concept that we strive to achieve in every case—requires more." *People v. Jackson*, 2024 IL App (1st) 241356, ¶ 116 (Mitchell, J., concurring in part and dissenting in part). The strength of the law lies in its capacity to confront doubt and reaffirm truth.

## *People v. Hill*, 2025 IL App (1st) 231340

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 95-CR-666801; the Hon. Michael R. Clancy, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Douglas R. Hoff, and Tomas G. Gonzalez, of State Appellate Defender's Office, of Chicago, for appellant. |
| **Attorneys for Appellee:** | Eileen O'Neill Burke, State's Attorney, of Chicago (John E. Nowak, Douglas P. Harvath, and Amari Dawson, Assistant State's Attorneys, of counsel), for the People. |